**CONSUMER LITIGATION LAW CENTER, APC**
September J. Katje, Esq., State Bar No. 227896
sk@consumerlitigationlawcenter.com
Jeffrey J. Ogorek, Esq., State Bar No. 285927
jjo@consumerlitigationlawcenter.com
100 North Citrus Ave., Suite 408
West Covina, California 91791
(800) 787-5616.  Fax: (888) 909-7947

Attorney for Plaintiffs, GARY KOLLER and CYNTHIA KOLLER

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

GARY KOLLER, an individual, and
CYNTHIA KOLLER, an individual,

    Plaintiffs,

    v.

SPECIALIZED LOAN SERVICING,
LLC, a Delaware Limited Liability
Company; B.F. SAUL MORTGAGE
COMPANY, a Maryland Limited
Liability Company; U.S. BANK
NATIONAL ASSOCIATION AS
TRUSTEE RELATING TO CHEVY
CHASE FUNDING LLC MORTGAGE
BACKED CERTIFICATES SERIES
2007-2; LAW OFFICES OF LES
ZIEVE; and all persons or entities
unknown claiming any legal or equitable
right, title, estate, lien or interest in the
property described in this complaint
adverse to Plaintiff's title thereto, and
DOES 1 through 25, inclusive,
      Defendants.

Case No.: 8:14-cv-00031-JVS-JPR

**Verified First Amended Complaint
For:**

1. **Fraud in Loan Origination**
2. **Fraud in Loan Servicing**
3. **Violation of California Bus. & Prof. Code §§ 17200 et seq. in Loan Origination**
4. **Wrongful Foreclosure**
5. **Negligence in Loan Origination**
6. **Negligence in Loan Servicing**
7. **Unjust Enrichment**
8. **Intentional Interference with Prospective Economic Advantage**
9. **Negligent Interference with Prospective Economic Advantage**
10. **Failure to Engage in Loss Mitigation (Cal. *Civ. Code* § 2923.5)**
11. **Reformation of a Fraudulent Contract and Restitution**
12. **Quiet Title**
13. **Declaratory Relief**

  **And Demand For Jury Trial
  Unlimited Jurisdiction**

NOW COMES the Plaintiffs, GARY KOLLER and CYNTHIA KOLLER ("Plaintiffs"), complaining of the Defendants, and each of them, the following:

## I.

## INTRODUCTION

1.      This is an action filed for misconduct related to Plaintiffs' negative amortization, adjustable rate mortgage ("ARM") loan that occurred in three distinct phases: (1) the loan origination, (2) the loan servicing, and (3) the instituting of wrongful foreclosure proceedings.

2.      As described in the allegations below, Defendants' misconduct resulted in the use of false and deceptive information, the issuance of an improper mortgage, premature and unauthorized foreclosure proceedings, and the violation of Plaintiffs' rights and protections as homeowners.   Each of the allegations regarding Defendants contained herein applies to instances in which one or more, and in some cases all, of the Defendants engaged in the conduct alleged.

## II.

## THE PARTIES

3.   Plaintiffs GARY KOLLER and CYNTHIA KOLLER are, and at all times herein mentioned were, residents of the State of California, County of Orange.   Plaintiffs, at all times relevant to this Complaint, were the owners of their primary residence commonly known as 3811 River Avenue, Newport Beach, California 92663[1] ("Subject Property").

4.      Defendant SPECIALIZED LOAN SERVICING, LLC ("SLS"), was and is a Delaware Limited Liability Company, doing business in the State of California as a residential lender and servicer.   SLS is the current servicer of

---

[1] Legal Description:  Lot 8 in Block 138 of River Section, in the City of Newport Beach, County of Orange, State of California, as per map recorded in Book 4, Page(s) 25 of Miscellaneous Maps, in the officer of the County Recorder of said County.
APN: 423-308-01

VERIFIED FIRST AMENDED COMPLAINT

CONSUMER LITIGATION LAW CENTER, APC

Plaintiffs' loan.  Capital One, N.A. transferred servicing rights to Plaintiffs' loan to SLS on or about February 24, 2010.  A true and correct copy of the Servicing Transfer Statement is attached hereto as Exhibit "A".

5.     Defendant B.F. SAUL MORTGAGE COMPANY ("B.F. Saul") was and is a Maryland Limited Liability Company, doing business in the State of California as a residential lender and servicer, and is the named lender under the Deed of Trust listing Plaintiffs as borrowers and that was recorded on May 4, 2007 ("Deed of Trust").  A true and correct copy of the Deed of Trust, Adjustable Rate Note and Adjustable Rate Rider are attached hereto as Exhibit "B".

6.     LAW OFFICES OF LES ZIEVE ("Zieve") is law firm doing business in the State of California, and is the current named trustee of record under the Notice of Substitution of Trustee substituting Zieve for the prior trustee, Chevy Chase Bank, F.S.B., and dated September 22, 2012 ("Substitution of Trustee").  A true and correct copy of the Substitution of Trustee is attached hereto as Exhibit "C".Defendant U.S. BANK NATIONAL ASSOCIATION AS TRUSTEE RELATING TO CHEVY CHASE FUNDING LLC MORTGAGE BACKED CERTIFICATES SERIES 2007-2 ("U.S. Bank"), was and is a National Association and the current named beneficiary under the Deed of Trust.  An Assignment of Deed of Trust recorded on June 1, 2011 ("Assignment"), granted, assigned, and transferred from Mortgage Electronic Registration Systems, Inc., as nominee for B.F. Saul, its successors and assigns to U.S. Bank all beneficial interest under the Deed of Trust that is the subject of this action.  A true and correct copy of the Assignment is attached hereto as Exhibit "D".

7.     Plaintiffs are informed, believe, and thereon allege that at all times material hereto, all Defendants operated through a common plan and scheme designed to conceal the material facts set forth below from Plaintiff, from the California public and from regulators, either directly or as successors-in-interest or affiliates of other Defendants. The concealment was completed, ratified and/or

CONSUMER LITIGATION LAW CENTER, APC

3

**VERIFIED FIRST AMENDED COMPLAINT**

confirmed by each Defendant herein, directly or as successor, agent, assignee or affiliate to another Defendant. Each Defendant was a perpetrator of the tortious acts set forth herein for its own monetary gain and as a part of a common plan developed and carried out with the other Defendants, or was a successor-in-interest to a Defendant that did the foregoing.

8. The Defendants that knowingly participated in the scheme are jointly and severally liable for their acts in devising, directing, knowingly benefitting from and ratifying the wrongful acts of the knowing participants.

9. Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 25 inclusive ("Does") and, therefore, sue these Defendants by such fictitious names. Plaintiffs will amend their Complaint to allege these Defendants true names and capacities when ascertained. Plaintiffs are informed, believe, and thereon allege that each of the fictitiously named Defendants are responsible in some manner for the injuries to Plaintiffs alleged herein and that such injuries were proximately caused by such Defendants.

## III.

## CALIFORNIA SUCCESSOR LIABILITY LAW

10. "'Successor in interest' is defined as: 'One who follows another in ownership or control of property. In order to be a 'successor in interest,' a party must continue to retain the *same rights* as original owner… and there must be **change in form only and not in substance** . . . .'" *Perez v. 222 Sutter St. Partners* (1990) 222 Cal.App.3d 938, 948, fn. 8 (quoting Black's Law Dict. (5th ed. 1979) p. 1283, col. 2 (emphasis added).) Successor liability is "'extremely fact sensitive.'" *Fisher v. Allis-Chalmers Corp. Product Liability Trust* (2002) 95 Cal.App.4th 1182, 1188 (quoting William P. O'Neill, Advanced Issues in Strategic Alliances (July 2000) 1193 PLI/Corp 351, 391). It does not lend itself well to a determination without a trial, or an evidentiary hearing at the very least.

CONSUMER LITIGATION LAW CENTER, APC

**VERIFIED FIRST AMENDED COMPLAINT**

CONSUMER LITIGATION LAW CENTER, APC

*Sunnyside Development Co., LLC v. Opsys Ltd.* (N.D.Cal. Aug. 29, 2007, No. C 05 0553 MHP) 2007 WL 2462142 at *6.

11.    Under California law, successor liability may be imposed on a corporation for the debts and liabilities of its predecessor in any of the following circumstances:    (1) the transaction amounts to a consolidation or merger of the two corporations, (2) the purchasing corporation is merely a continuation of the selling corporation, or (3) the transaction is entered into fraudulently to escape liability for debts. *Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 28.

12.    It is well settled law that a corporation that purchases the assets of another assumes the first corporation's liabilities when the transfer of assets to the purchaser is for the fraudulent purpose of escaping the sellers' liabilities.    See, e.g., *Ray v. Alad Corp., supra* 19 Cal.3d 22; *Blank v. Olcovich Shoe Corp.* (1937) 20 Cal.App.2d 456, 461.    Accordingly, the Uniform Fraudulent Transfer Act obviates any shield to liability from a transfer of assets when "the transfer made or obligation incurred" was made "(w)ithout receiving a reasonably equivalent value in exchange for the transfer or obligation." Cal. *Civ. Code* § 3429.04(a)(2).

13.    Additionally, a defendant is liable for the fraud of a predecessor when information or documents from the transaction, available to the successor at the time of purchase, suggests that fraud has occurred.    See, e.g. *Maberry v. Said*, 911 F. Supp. 1393, 1399-1401 (D. Kan. 1995), later opinion, 927 F. Supp. 1456 (D. Kan. 1996) (lender held liable for fraud where it ratified the fraud and accepted the benefits therefrom).    Lack of knowledge suggestive of fraud is also not a defense to successor liability where the defendant had limited information as to any fraud, but "failed to inquire further because he was afraid of what the inquiry would yield . . . [because] [w]illful blindness is knowledge enough." *Louis Vuitton S.A. v. Lee* (7th Cir. 1989) 875 F.2d 584, 590; *United States v. Campbell* (4th Cir. 1992) 977 F.2d 854, 857.

**VERIFIED FIRST AMENDED COMPLAINT**

CONSUMER LITIGATION LAW CENTER, APC

14.   Plaintiffs allege that Defendant B.F. Saul transferred the Note, Deed of Trust, and all Riders, exhibits, and attachments thereto that are the subject of this lawsuit with the fraudulent intent of escaping the rampant liability tethered to the fraudulent inducement in origination of the subject home mortgage loan.

15.   Further, "(t)he surviving corporation under a statutory merger is responsible for the liabilities of the merged corporation under both common law and statute." *Petrini v. Mohasco Corp.* (1998) 61 Cal.App.4th 1091, 1098. This is true regardless of whether the liabilities were known at the time of the merger. *Id.*

16.   In short, the controlling point is that successor liability, like alter ego and similar principles, is an equitable doctrine. As with other equitable doctrines, "it is appropriate to examine successor liability issues on their own unique facts . . . [and] [c]onsiderations of fairness and equity apply." *CenterPoint Energy, Inc. v. Superior Court* (2007) 157 Cal.App.4th; *c.f.*, *Rego v. ARC Water Treatment Co.* (3d Cir. 1999) 181 F.3d 396 ("we emphasize that each successor liability case must be determined on its own facts.").

17.   Defendants servicer SLS, beneficiary U.S. Bank, and trustee Zieve, are the successors in interest to the former servicer Capital One, N.A., the former trustee Chevy Chase Bank, F.S.B., and the original lender B.F. Saul, and, therefore, incur all such liability for their predecessors as to the allegations in this First Amended Complaint.

## IV.

## JURISDICTION AND VENUE

18.   This Court has personal jurisdiction over this matter pursuant to the California Constitution, Article XI, Section 10 and California *Code of Civil Procedure* section 410.10 because Defendants transacted business in this District and committed the acts complained of herein in California.

/ / /

/ / /

**VERIFIED FIRST AMENDED COMPLAINT**

19.     Venue is proper in this District pursuant to California *Code of Civil Procedure* section 395.5 because Defendants entered into the underlying contract with Plaintiff in the above-referenced jurisdiction and the payment obligations are to be performed in the above-referenced District.

**V.**

**FACTUAL ALLEGATIONS**

20.     In or around April 2007, Plaintiffs spoke with a representative of B.F. Saul's agent, Windsor Capital Mortgage Corp. ("Agent"), to inquire about refinancing their previous adjustable interest rate home mortgage loan to a new, fixed interest rate loan.

21.     B.F. Saul's Agent asked Plaintiffs their income and, without any further documentation to verify income, informed Plaintiffs that they qualified for a $1,350,000 loan with a fixed interest only payment for the first five years but did not explain any other information about the loan to Plaintiffs.

22.     B.F. Saul's Agent qualified Plaintiffs for the above-referenced loan by falsely inflating Plaintiffs' monthly income from approximately $14-$15,000 per month to $30,000 per month while knowing that Plaintiffs would not be able to afford monthly payments.

23.     B.F. Saul's Agent also assured Plaintiffs that they could refinance the loan later, as they had done with their previous loan, knowing that this was likely to be false if Plaintiff's could not afford the loan.

24.     Based on assurances and representations from B.F. Saul's Agent, Plaintiffs signed a Deed of Trust dated April 19, 2007 and Adjustable Rate Rider with a five-year payment option tied to the Monthly LIBOR Index (collectively "Loan Agreement") that was recorded on May 4, 2007.

25.     B.F. Saul's Agent failed to disclose, and Plaintiffs were not aware and could not have been aware at time of signing, that Plaintiffs' monthly payments under Loan Agreement were not enough to even cover an interest only

CONSUMER LITIGATION LAW CENTER, APC

7

**VERIFIED FIRST AMENDED COMPLAINT**

CONSUMER LITIGATION LAW CENTER, APC

payment and, instead, negative amortization would accrue and the principal balance under the Loan Agreement would grow as long as Plaintiffs paid the stated monthly payment for the first five years of the loan.

26.    B.F. Saul's Agent also failed to disclose, and Plaintiffs could not have been aware that, though Plaintiffs' monthly payment was fixed for five years, the interest rate was not fixed and could adjust monthly starting from the date the first payment was due under the Loan Agreement.

27.    At the time of signing, and based on false representations by B.F. Saul's Agent, Plaintiffs believed that they were making interest only payments under the Loan Agreement for the first five years and were not aware that the required monthly payments were actually far less than interest only payments would be for the first five years.

28.    B.F. Saul's Agent failed to disclose, and Plaintiffs were not aware, nor could they have been aware, at the time of signing, that the initial interest rate would change on June 1, 2007 and Plaintiffs' first payment was also due on June 1, 2007.

29.    B.F. Saul's Agent failed to disclose, and Plaintiffs were not aware, nor could they have been aware, at time of signing, that the Loan Agreement's interest rate was not actually fixed for the first five years of the loan term and that, in fact, only the monthly payment was fixed for five years, until June 1, 2012— and negative amortization was accruing the entire time.

30.    B.F. Saul's Agent failed to disclose, and Plaintiffs were not aware, nor could they have been aware, at time of signing that their $5,091.73 monthly payments for the first five years until June 1, 2012 were actually thousands of dollars less per month than an interest only payment would be—thus, Plaintiffs' principal balance was growing the entire time and the monthly payments would likely—and in fact did—adjust upwards in the first five years because the principal balance could only grow to 115% of the original principal loan balance.

**VERIFIED FIRST AMENDED COMPLAINT**

31.     Finally, B.F. Saul's Agent also failed to explain Plaintiffs that the loan included a pre-payment penalty.

32.     In early 2011, the purportedly fixed monthly payments under the Loan Agreement adjusted upwards sharply because negative amortization had caused the principal balance to reach the 115% maximum cap on the principal balance.

33.     Once the monthly payments Plaintiffs were previously informed and believed would be fixed for at least the first five years instead jumped up, Plaintiffs became concerned and contacted their current servicer, SLS, to discuss loan modification options.

34.     SLS employees informed Plaintiffs that they had to stop making their monthly payment and default on the Loan Agreement in order for Defendants to consider Plaintiffs for a loan modification.

35.     Acting on instructions, assurances, and representations from SLS's employees, Plaintiffs stopped making monthly payments under the Loan Agreement in or around February 2011 and fell into default so that SLS would consider Plaintiffs for a loan modification.

36.     On April 12, 2011, SLS, through its co-defendant Zieve, caused a Notice of Default and Election to Sell Under Deed of Trust ("NOD") to be recorded on the Subject Property after Plaintiffs—on Defendant's instruction— fell behind on their payments under the Loan Agreement.  A true and correct copy of the NOD is attached hereto as Exhibit "E".

37.     Plaintiffs are informed, believe, and thereon allege that neither SLS nor Zieve posted a copy of the NOD at the Subject Property but only provided a copy of the NOD by regular mail.

/ / /

/ / /

/ / /

VERIFIED FIRST AMENDED COMPLAINT

38.    Plaintiffs received a modification in or around May 2011 with an adjustable interest rate of 2% for the first two years, 3% in the third year, and 3.75% thereafter and that deferred—but did not reduce—the principal balance then due.

39.    Plaintiffs made their modified loan payments from May 2011 through May 2012 and applied for a second modification in June 2012.

40.    Plaintiffs defaulted on the first modification in December 2012.

41.    SLS, through its trustee co-defendant Zieve, caused a Notice of Trustee's Sale to be recorded on December 14, 2012 ("NTS"). A true and correct copy of the NTS is attached hereto as Exhibit "F".

42.    During the application process for Plaintiffs' second modification, SLS through its employees repeatedly asked for copies of the same documents over and over, shuffled Plaintiffs between over thirty points of contact at SLS for months, erroneously stated that the modification application was closed when it had, in reality been sent to underwriting, failed to return voicemail messages, and requested profit and loss statements repeatedly—all over the course of a year.

43.    Even though Plaintiffs received a letter from SLS purporting to assign Plaintiffs to a single point of contact to discuss their loan modification, Plaintiffs never spoke to this contact person and the contact person never returned any of Plaintiffs' messages over the course of the entire year-long modification application process.

44.    On August 8, 2013, after over a year of repeatedly complying with every request made by SLS, Plaintiffs were finally informed by SLS's employee "Shauna" that Defendants approved Plaintiffs for a three month trial modification plan.

45.    On August 16, 2013, Plaintiffs followed up with SLS again after they did not receive any of the promised modification documents from SLS but this time were summarily denied for a modification by SLS employee "Michael" who

CONSUMER LITIGATION LAW CENTER, APC

CONSUMER LITIGATION LAW CENTER, APC

1  informed Plaintiffs that the prior approval was a mistake and then transferred
2  Plaintiffs to a supervisor named "Anthony" who confirmed that SLS denied
3  Plaintiffs' loan modification application despite the fact that SLS stated Plaintiffs
4  were approved for a modification only days earlier.

5      46.    SLS informed Plaintiffs by mail on October 10, 2013 that their
6  modification application was denied because the ratio of Plaintiffs' gross income
7  to the allowable mortgage payment did not fit the parameters of Defendants'
8  program without providing any information on what the particular parameters
9  were and how Plaintiffs failed to meet those parameters.

10     47.    However, Plaintiffs are informed, believe, and thereon allege that
11 SLS did not properly calculate the ratio of Plaintiffs' gross monthly income to the
12 allowable monthly mortgage expense for Plaintiffs' program because as recently
13 as June 27, 2013 Plaintiffs informed SLS by mail that the loan to value ratio on
14 the Subject Property had reached 78% and that the force-placed lender paid
15 mortgage insurance could be removed.

16     48.    Furthermore, on or about December 16, 2013, Plaintiffs, through a
17 third party Secure Homeowner Solutions ("SHS") working on Plaintiffs behalf,
18 spoke with an SLS employee named Matt who stated that Plaintiffs could enter
19 into a reinstatement plan wherein Plaintiffs would pay down half of the past due
20 amount under the Loan Agreement in one payment (approximately $50,000), and
21 pay down the remaining past due amount over the course of a year in monthly
22 installments in order to bring the Loan Agreement current and out of default.

23     49.    Moreover, Plaintiffs' gross monthly income has changed since
24 Plaintiffs applied for their most recent modification so that, between Plaintiffs'
25 changed monthly income and a monthly mortgage payment that does not include
26 private mortgage insurance, Plaintiffs are informed, believe, and thereon allege
27 that they meet the criteria for a modification under Defendants' guidelines.

28 ///

**VERIFIED FIRST AMENDED COMPLAINT**

CONSUMER LITIGATION LAW CENTER, APC

# FIRST CAUSE OF ACTION
## FRAUD IN LOAN ORIGINATION
### (Against Defendants B.F. Saul, SLS, U.S. Bank, and Does 1–25)

50.   Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

51.   B.F. Saul, through its Agent Windsor Capital, informed Plaintiffs that the Loan Agreement included a fixed interest rate for the first five years, that Plaintiffs would make interest only payments for the first five years in a fixed amount, and that Plaintiffs would be able to refinance the Loan Agreement when the purported five year interest-only payment period expired.

52.   Plaintiffs are informed, believe, and thereon allege that B.F. Saul and its successors in interest, co-Defendants named herein, knew these representations to be false at the time they made them because Defendants had extensive experience in lending, loan servicing, and origination, and were privy to the actual terms of the Subject Loan.

53.   Plaintiffs are informed, believe, and thereon allege that Defendants intended to deceive Plaintiffs so that Plaintiffs would execute the Loan Agreement and thereby generate ongoing profits for Defendants, even in the event of foreclosure as Defendants could profit off the collateral value of the Subject Property.

54.   Plaintiffs relied on Defendants' misrepresentations because Plaintiffs executed the Loan Agreement and made required monthly payments thereunder. Moreover, Plaintiffs had a right to rely on Defendants' misrepresentations to the extent that Plaintiffs were not involved in the real estate or financial services industry and therefore relied on and trusted Defendants' knowledge, experience, expertise, advice, and representations in these matters.

/ / /

/ / /

55.     Plaintiffs only became suspicious, or had reason to become suspicious of Defendants' misrepresentations in or around early 2011 when their purportedly fixed, five-year interest only payments adjusted upwards sharply when the Loan Agreement had reached its 115% maximum cap that was never disclosed to Plaintiffs.

56.     As a result of Plaintiffs' reliance on Defendants' misrepresentations, Plaintiffs have suffered and continue to suffer pecuniary damages due to excessively high mortgage payments, fees, and costs in an amount to be proven at time of trial but no less than the jurisdictional minimum of this Court.

57.     Plaintiffs are further entitled to punitive damages to punish and deter Defendants from such outrageous, reckless conduct and to deter other lenders, servicers, and originators who are likely to commit similarly reckless acts and omissions in the future.

58.     Plaintiffs also face near certain loss of the Subject Property due to Defendants wrongful foreclosure proceedings against the Subject Property caused by Defendants' fraudulent acts and omissions.

59.     Plaintiffs are therefore entitled to such relief as is set forth in this Cause of Action and to such further relief set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## SECOND CAUSE OF ACTION

### FRAUD IN LOAN SERVICING

### (Against Defendants SLS and Does 1-25)

60.     Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

61.     SLS informed Plaintiffs that they had to stop making their monthly payments under the Loan Agreement and go into default otherwise Defendants would not modify the Loan Agreement.

/ / /

**VERIFIED FIRST AMENDED COMPLAINT**

CONSUMER LITIGATION LAW CENTER, APC

CONSUMER LITIGATION LAW CENTER, APC

62.     Plaintiffs are informed, believe, and thereon allege that SLS knew these representations to be false at the time they made them because SLS already knew Plaintiffs were having difficulty making payments and wanted to foreclose on the Subject Property and re-sell it for a profit.

63.     Plaintiffs are informed, believe, and thereon allege that SLS intended to deceive Plaintiffs so that Plaintiffs would fall into default, obtain either no modification or an unaffordable modification, and provide SLS the chance to foreclose on the Subject Property and re-sell it for a profit.

64.     Plaintiffs relied on SLS's misrepresentations because Plaintiffs—on SLS's instructions—stopped making their mortgage payment and fell into default on the understanding that Defendants would then work with Plaintiffs to give an affordable loan modification.

65.     Plaintiffs only became suspicious of SLS's misrepresentations in or around early 2011 when their purportedly fixed, five-year interest only payments adjusted upwards sharply due to undisclosed negative amortization and Plaintiffs contacted SLS to discuss loss mitigation options.

66.     As a result of Plaintiffs' reliance on SLS's misrepresentations, Plaintiffs have suffered and continue to suffer pecuniary damages due to excessively high mortgage payments, fees, and costs in an amount to be proven at time of trial but no less than the jurisdictional minimum of this Court.

67.     Furthermore, even though SLS offered Plaintiffs a reinstatement plan following denial of a loan modification application, SLS later denied that they had offered Plaintiffs the plan despite the fact that Plaintiffs were ready, willing, and able to enter into such an agreement.

68.     Plaintiffs also face near certain loss of the Subject Property due to SLS's wrongful foreclosure proceedings against the Subject Property caused by Defendants' fraudulent acts and omissions.

/ / /

VERIFIED FIRST AMENDED COMPLAINT

69.     Plaintiffs are therefore entitled to such relief as is set forth in this Cause of Action and to such further relief set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

### THIRD CAUSE OF ACTION

### VIOLATION OF CALIFORNIA BUS. & PROF. CODE § 17200, ET SEQ.

### (Against All Defendants)

70.     Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

71.     California *Business & Professions Code* section 17200, California's Unfair Competition Law ("UCL"), prohibits "any **unlawful**, **unfair** or **fraudulent** business act or practice." Cal. Bus. & Prof. Code § 17200 (emphasis added). The code section is written in the disjunctive, and thus requires that only one prong is satisfied in order to find liability. *Cel-Tech Comm., Inc. v. Los Angeles Cellular Tel. Co.* (1999) 20 Cal.4th 163, 180.

72.     **Unlawful:** "The 'unlawful' practices prohibited by section 17200 are **any** practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or **court-made**." *Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 838–39 (emphasis added). These predicate unlawful business acts and practices include, but are not limited to, California *Civil Code* section 1709 (fraud in loan origination and servicing), *Civil Code* section 1710 (negligent misrepresentation), *Civil Code* section 2923.6 (violation of Homeowner Bill of Rights), and *Civil Code* section 1714(a) (negligence). A violation of any of these underlying laws is a *per se* violation of section 17200.

73.     Plaintiffs are informed, believe, and thereon allege that Defendants, and each of them, violated *Civil Code* section 1709 as alleged hereinabove in that B.F. Saul, through its acts and omissions, misrepresented the terms and affordability of the Loan Agreement, causing Plaintiffs to agree to a loan they would not have otherwise, to Plaintiffs' financial detriment. SLS further violated

15

VERIFIED FIRST AMENDED COMPLAINT

CONSUMER LITIGATION LAW CENTER, APC

*Civil Code* section 1709 because SLS instructed Plaintiffs to default on the Loan Agreement in order to receive a modification but then gave Plaintiffs an unaffordable, adjustable interest rate modification that prevented Plaintiffs from coming out of default so that SLS could ultimately foreclose on the Subject Property. Plaintiffs are informed, believe, and thereon allege that at the time Defendants made the factually untrue statements described hereinabove during the origination and servicing process, Defendants did not believe them to be true.

74. Plaintiffs are informed, believe, and thereon allege that Defendants, and each of them, violated *Civil Code* section 1714(a) in that Defendants owed a duty of care to Plaintiffs as the lenders, servicers, and trustees of the Subject Loan, that Defendants conduct fell below the standard of care that Defendants owed to Plaintiffs, that Defendants conduct was the actual and proximate cause of the harm to Plaintiffs alleged herein and that Plaintiffs suffered damages as alleged herein as a result of Defendants' negligent acts and omissions.

75. Finally, Defendants' acts and omissions while originating and servicing the Subject Loan violate California *Civil Code* section 1572 because Plaintiffs were induced to enter into the Subject Loan through the suppression of facts known by B.F. Saul, *Civil Code* section 1708 because the Subject Loan originated by B.F. Saul, sold to U.S. Bank, and serviced by SLS injured Plaintiffs by destroying their credit rating, *Civil Code* section 1709 because Defendants wrongfully and willfully deceived Plaintiffs into changing position to their financial detriment in both taking the loan and in being denied any affordable modification or reinstatement plan, and *Civil Code* section 1711 because Defendants violated established California public policies to protect the public from deceitful conduct.

76. **Unfair:** "[A]n unfair business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to the consumer." *People v. Casa Blanca*

CONSUMER LITIGATION LAW CENTER, APC

*Convalescent Homes Inc.* (1984) 159 Cal.App.3d 509, 530.  Furthermore, the "unfair" standard is intentionally broad and allows courts maximum discretion to prohibit new schemes to defraud.  *Motors, Inc. v. Times Mirror Co.* (1980) 102 Cal.App.3d 735, 740.  Finally, because section 17200 is disjunctive, practices that may be lawful may nevertheless be unfair.  *Id.*

77.     Defendants, and each of them, engaged in unfair business practices because B.F. Saul, through its Agent, deceived Plaintiffs as to the terms of the Subject Loan and failed to explain the terms of the Loan Agreement to Plaintiffs.  SLS then refused to assist Plaintiffs to avoid foreclosure, failed to review Plaintiffs for a modification in good faith, instructed Plaintiffs to default on their loan, offered Plaintiff a loan modification only to deny that SLS had made any such offer and yet again offered Plaintiff a reinstatement plan only to deny having made such an offer.

78.     As alleged hereinabove, when Defendant originators, successors, and assigns had an opportunity to mitigate the adverse consequences of the predatory Loan Agreement, they either did nothing to relieve Plaintiffs or engaged in bad faith "modification assistance" by instructing Plaintiffs to default and ultimately denying Plaintiffs for a modification for which they should have qualified.

79.     SLS's purported loan assistance perpetuated a pattern of deceptive and unfair business practices by failing and refusing to provide Plaintiffs with a loan modification pursuant to the Federal Home Affordable Mortgage Program ("HAMP") or any other internal loan modification program for which they qualified.  SLS's unfair practices include:

        a.     charging excessive or improper fees for default-related services;

        b.     providing false or misleading information in response to inquiries;

        c.     failing to perform proper loan modification underwriting;

VERIFIED FIRST AMENDED COMPLAINT

d.  failing to gather or losing loan modification application documentation and other paper work;

e.  failing to provide adequate staffing to implement programs;

f.  failing to adequately train staff responsible for loan modifications;

g.  failing to establish adequate processes for loan modifications;

h.  providing false or misleading information to while initiating foreclosures while Plaintiffs were in good faith actively pursuing a loss mitigation alternative offered by Defendants;

i.  miscalculating Plaintiffs' eligibility for loan modification programs;

j.  misleading Plaintiffs by representing that loan modification applications would be handled promptly yet failing to act in a timely manner; and

k.  wrongfully denying Plaintiffs' modification application.

80.  Instead of mitigating the drastic consequences of the predatory Subject Loan as required, SLS, along with its trustee, Zieve, continued foreclose proceedings on the Subject Property.

81.  Plaintiffs are informed, believe, and thereon allege that Defendants failed to seek alternatives to foreclosure and continued with the foreclosure process as part of their company policies to deny contractual and stipulated benefits to those such as Plaintiffs and instead foreclose and profit on the collateral value of the Subject Property. These policies were put in place despite the fact that Defendants are under a duty to offer modification and foreclosure prevention relief in good faith under California law.

82.  The unfair practices of SLS in the servicing of Plaintiffs' loan violate public policy favoring loan modification. This policy is evidenced by California *Civil Code* section 2923.6 and HAMP.

18

83.   **Fraudulent**:   A fraudulent business practice under Business and Professions Code section 17200 if "members of the public are likely to be deceived." *Committee on Children's Television v. General Foods Corp.* (2002) 35 Cal.3d 197, 211.   Furthermore, even lawful contract terms presented in a deceptive manner are fraudulent under section 17200.   *Boschma v. Home Loan Ctr., Inc.* (2011) 198 Cal.App.4th 230, 253.   Such fraudulent practices do not require the plaintiff show actual deception, reliance, or damages.   *Committee on Children's Television v. General Foods Corp.*, *supra*, 35 Cal.3d at 211. Defendants' acts and omissions, as alleged herein, were likely to deceive members of the public and, in fact, did deceive Plaintiffs.

84.   Defendants fraudulent business practices included, but were not limited to:

a.   B.F. Saul marketing the Subject Loan on the basis of exaggeration, misrepresentation, and/or the concealment of material facts;

b.   B.F. Saul failing to disclose the whole truth about the Subject Loan's underwriting and associated costs;

c.   SLS instructing Plaintiffs to default on their loan to achieve an affordable modification;

d.   SLS informing Plaintiffs that they had received a modification and later a reinstatement plan only to deny such representations on both occasions; and

e.   SLS failing to review Plaintiffs for a loan modification in good faith so that Defendants could foreclose on the Subject Property.

85.   Defendants' unlawful, unfair, and fraudulent business practices present a continuing threat of deception to both Plaintiffs and members of the public at large as alleged herein.   Plaintiffs and other members of the general

CONSUMER LITIGATION LAW CENTER, APC

**VERIFIED FIRST AMENDED COMPLAINT**

1  public have no other adequate remedy at law that will prevent Defendants'
2  misconduct as alleged herein from occurring, and reoccurring, in the future to
3  Plaintiffs and members of the general public.

4      86.    As a direct and proximate result of Defendants' unlawful, unfair, and
5  fraudulent business practices alleged herein, Plaintiffs have suffered extensive
6  pecuniary damages as alleged herein as well as threatened loss of their real
7  property.

8      87.    As a result of Plaintiffs' reliance on Defendants' misrepresentations,
9  Plaintiffs have suffered and continue to suffer pecuniary damages due to
10 excessively high mortgage payments, fees, and costs in an amount to be proven at
11 time of trial but no less than the jurisdictional minimum of this Court.

12     88.    Plaintiffs also face near certain loss of the Subject Property due to
13 Defendants' wrongful foreclosure proceedings against the Subject Property caused
14 by Defendants' unlawful, unfair, and fraudulent acts and omissions.

15     89.    Plaintiffs are therefore entitled to such relief as is set forth in this
16 Cause of Action and to such further relief set forth below in the section captioned
17 Prayer for Relief which is by this reference incorporated herein.

18                        **FOURTH CAUSE OF ACTION**
19                        **WRONGFUL FORECLOSURE**
20        **(Against Defendants U.S. Bank, Zieve, SLS, and Does 1-25)**

21     90.    Plaintiffs hereby reallege and incorporate by reference all preceding
22 paragraphs as though fully set forth herein.

23     91.    Plaintiff is informed, believes, and thereon alleges that Plaintiffs'
24 Deed of Trust was purportedly assigned by B.F. Saul to U.S. Bank as trustee for
25 the residential mortgage backed security entitled Chevy Chase Funding LLC
26 Mortgage Backed Certificates Series 2007-2 via an Assignment of Deed of Trust
27 recorded June 1, 2011.

28

CONSUMER LITIGATION LAW CENTER, APC

**VERIFIED FIRST AMENDED COMPLAINT**

CONSUMER LITIGATION LAW CENTER, APC

92.     Plaintiffs are informed, believe, and thereon allege that Chevy Chase Bank, F.S.B. issued investment bonds in the mortgage backed trust identified hereinabove as the Chevy Chase Funding LLC Mortgage Backed Certificates Series 2007-2 ("Mortgage Trust").  Plaintiffs are informed, believe, and thereon allege that the Mortgage Trust was registered with the Securities and Exchange Commission.

93.     Plaintiffs are informed, believe, and thereon allege that the Subject Loan was never transferred into the Mortgage Trust Prior to the trust's closing date.

94.     Plaintiffs are informed, believe, and thereon allege that the above referenced Assignment of Deed of Trust from B.F. Saul to U.S. Bank as trustee for the Mortgage Trust on June 6, 2011 was therefore ineffective to assign the Subject Loan as the Mortgage Trust was closed at that time.

95.     Therefore, Plaintiffs are informed, believe, and thereon allege that because the transfer was ineffective, Defendants had no authority to file the NOD and subsequent NTS on the Subject Property and no authority to conduct a foreclosure sale on the Subject Property.

96.     As a result of the actions described above that Defendants have taken without any authority to do so, Defendants should be prevented from proceeding with the wrongful trustee's sale as Defendants lack standing to conduct said sale.

## FIFTH CAUSE OF ACTION

## NEGLIGENCE IN LOAN ORIGINATION

### (Against Defendants B.F. Saul, SLS, U.S. Bank, and DOES 1-25)

97.     Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

98.     California law recognizes a cause of action for negligence arising from negligent breach of a contractual duty.

///

99.     Plaintiffs are informed, believe, and thereon allege that Defendants had a contractual duty to exercise reasonable care and skill as the originators of the Subject Loan or the successors thereto.

100.    B.F. Saul, and its successors in interest to the Loan Agreement, breached the duty of care that they owed to Plaintiffs in originating the Loan Agreement when, through B.F. Saul's Agent, B.F. Saul falsely inflated Plaintiffs' income to nearly double Plaintiffs' true income. Defendants informed Plaintiffs that they would be paying a fixed, interest only payment for the first five years while, in reality, the Loan Agreement contained a fixed payment for the first five years that was less than interest only and caused the principal balance of the Subject Loan to increase due to negative amortization. Defendants assured Plaintiffs that they could refinance the Subject Loan at a later time with no reasonable grounds to believe that was true. Defendants informed Plaintiffs that the interest rate was fixed for the first five years when in reality the interest rate was adjusting with the LIBOR index for the first five years. Defendants informed Plaintiffs that their initial interest rate would be 8.250% when, in reality, Defendants had no reason to believe this was true because the interest rate was set to adjust by the first mortgage payment date.

101.    As a direct and proximate result of Defendants' failure to exercise due care in originating the Subject Loan, Plaintiffs are now stuck with an unaffordable loan, have suffered tens of thousands of dollars in negative amortization, incurred numerous fees and costs and are facing loss of the Subject Property, including the equity they have built in the Subject Property.

102.    Based on Defendants' negligent acts and omissions as alleged hereinabove, Plaintiffs are entitled to general and special damages in an amount to be proven at time of trial but in any event no less than the jurisdictional minimum of this Court.

/ / /

VERIFIED FIRST AMENDED COMPLAINT

CONSUMER LITIGATION LAW CENTER, APC

103.    Plaintiffs are further entitled to punitive damages to punish and deter Defendants from such outrageous, reckless conduct and to deter other lenders, servicers, and originators who are likely to commit similarly reckless acts and omissions in the future.

104.    Plaintiffs are therefore entitled to such relief as is set forth in this Cause of Action and to such further relief set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## SIXTH CAUSE OF ACTION
## NEGLIGENCE IN LOAN SERVICING
### (Against Defendants SLS, U.S. Bank, and DOES 1-25)

105.    Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

106.    California law recognizes a cause of action for negligence arising from negligent breach of a contractual duty.

107.    Plaintiffs are informed, believe, and thereon allege that Defendants had a contractual duty to exercise reasonable care and skill as the servicers of the Subject Loan or the successors thereto.

108.    Defendants breached their duties to Plaintiffs in that SLS rejected Plaintiffs' partial loan payments and instructed Plaintiffs to default on the Loan Agreement to apply for a modification.  Defendants provided a first modification that was clearly unaffordable and prevented Plaintiffs from curing the very default that Defendants had lured them into.  Defendants recorded a NOD and NTS without authority to do so as the Loan Agreement was never timely securitized in the Mortgage Trust.  SLS then stated that Plaintiffs received a second loan modification only later to deny that Plaintiffs received any such modification. Later, SLS similarly stated that Plaintiffs received a reinstatement plan only to deny having made such an offer yet again.  Finally, SLS failed to grant the second modification by miscalculating Plaintiffs' gross monthly income and failing to

**VERIFIED FIRST AMENDED COMPLAINT**

CONSUMER LITIGATION LAW CENTER, APC

CONSUMER LITIGATION LAW CENTER, APC

account for the fact that Plaintiffs are no longer required to pay private mortgage insurance under the Loan Agreement.

109.   SLS's acts and omissions were both the actual and proximate cause of Plaintiffs' injuries because Plaintiffs would not have defaulted on the Loan Agreement without SLS's express instructions to do so.  Plaintiffs would not have an NOD or NTS recorded on the Subject Property had Defendants realized that they had no authority to foreclose on Plaintiffs.  Plaintiffs would have taken additional loss mitigation steps sooner had SLS not given them two different answers about the second modification attempt.  Finally, Plaintiffs are informed, believe, and thereon allege that they would already have qualified for a second loan modification had SLS properly accounted for Plaintiffs' true gross monthly income and a cancellation of private mortgage insurance.

110.   As a result of Defendants' negligent acts and omissions, Plaintiffs have suffered and continue to suffer unaffordable loan payments, suffered tens of thousands of dollars in negative amortization, numerous fees and costs, and are facing loss of the Subject Property, including the equity they have built in the Subject Property.

111.   Based on Defendants' negligent acts and omissions as alleged hereinabove, Plaintiffs are entitled to general and special damages in an amount to be proven at time of trial but in any event no less than the jurisdictional minimum of this Court.

112.   Plaintiffs are further entitled to punitive damages to punish and deter Defendants from such outrageous, reckless conduct and to deter other lenders, servicers, and originators who are likely to commit similarly reckless acts and omissions in the future.

113.   Plaintiffs are therefore entitled to such relief as is set forth in this Cause of Action and to such further relief set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

CONSUMER LITIGATION LAW CENTER, APC

## SEVENTH CAUSE OF ACTION

### UNJUST ENRICHMENT

### (Against Defendants SLS, Zieve, U.S. Bank, and DOES 1-25)

114.   Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

115.   Plaintiffs are informed, believe, and thereon allege that Defendants, and each of them, have obtained insurance on the Subject Loan that will compensate Defendants due to default and/or a trustee's sale.

116.   Plaintiffs are further informed, believe, and thereon allege that the Subject Property's value is currently greater than the amount Plaintiffs' owe under the Loan Agreement.

117.   Defendants will, therefore, be unjustly enriched if Defendants foreclose on the Subject Property as they will be compensated both through the foreclosure and again through insurance on the Subject Loan.

118.   Plaintiffs are therefore entitled to any proceeds from the insurance and sale of the Subject Property beyond the amount due and owing as of the trustee's sale date in order to prevent Defendants' unjust enrichment in an amount to be proven at time of trial but in any event no less than the jurisdictional minimum of this Court.

## EIGHTH CAUSE OF ACTION

### INTENTIONAL INTERFERENCE WITH

### PROSPECTIVE ECONOMIC ADVANTAGE

### (Against Defendants SLS and Zieve)

119.   Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

120.   An economic relationship existed between Plaintiffs and the beneficiary under the Loan Agreement whereby Plaintiffs expected the probable future economic benefits of owning the Subject Property free and clear along with

VERIFIED FIRST AMENDED COMPLAINT

equity growth in the Subject Property. The beneficiary expected interest income under the Loan Agreement.

121.   Defendants SLS and Zieve knew of the existing economic relationship between the beneficiary and Plaintiffs as SLS services the Subject Loan and Zieve is the purported trustee under the Subject Loan's deed of trust.

122.   Defendants intentionally interfered with the relationship between Plaintiffs and the beneficiary by instructing Plaintiffs to default, deceiving Plaintiffs as to their ability to repay under the Loan Agreement, recording a NOD and subsequent NTS on the Subject Property, and failing to review the Loan Agreement for a modification in good faith.

123.   Defendants actually disrupted the economic relationship between Plaintiffs and the beneficiary because Plaintiffs defaulted based on Defendants' recommendations to do so, do not have a modification for which they are qualified based on Defendants' acts and omissions, and are facing an improper foreclosure sale.

124.   Defendants' acts proximately caused Plaintiffs' harm because, as a result of Defendants interference between Plaintiffs and the beneficiary, Plaintiffs have incurred extensive penalties, an excessive mortgage payment, default, and threatened loss of the Subject Property.

125.   Based on Defendants' negligent acts and omissions as alleged hereinabove, Plaintiffs are entitled to general and special damages in an amount to be proven at time of trial but in any event no less than the jurisdictional minimum of this Court.

126.   Plaintiffs are further entitled to punitive damages to punish and deter Defendants from such outrageous, reckless conduct and to deter other lenders, servicers, and originators who are likely to commit similarly reckless acts and omissions in the future.

**VERIFIED FIRST AMENDED COMPLAINT**

CONSUMER LITIGATION LAW CENTER, APC

127.   Plaintiffs are therefore entitled to such relief as is set forth in this Cause of Action and to such further relief set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## NINTH CAUSE OF ACTION

## NEGLIGENT INTERFERENCE WITH

## PROSPECTIVE ECONOMIC ADVANTAGE

### (Against Defendants SLS and Zieve)

128.   Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

129.   An economic relationship existed between Plaintiffs and the beneficiary under the Loan Agreement whereby Plaintiffs expected the probable future economic benefits of owning the Subject Property free and clear along with equity growth in the Subject Property.  The beneficiary expected interest income under the Loan Agreement.

130.   Defendants SLS and Zieve knew of the existing economic relationship between the beneficiary and Plaintiffs as SLS services the Subject Loan and Zieve is the purported trustee under the Subject Loan's deed of trust.

131.   Defendants interfered with the relationship between Plaintiffs and the beneficiary by instructing Plaintiffs to default, deceiving Plaintiffs as to their ability to repay under the Loan Agreement, recording an NOD and subsequent NTS on the Subject Property, and failing to review the Loan Agreement for modification in good faith.

132.   Defendants, through the acts and omissions described hereinabove, failed to exercise due care in performing their obligations under the Loan Agreement as servicers, originators, lenders, and trustees.

133.   Defendants' negligent acts and omissions actually disrupted the economic relationship between Plaintiffs and the beneficiary because Plaintiffs defaulted based on Defendants' recommendations to do so, do not have a

**VERIFIED FIRST AMENDED COMPLAINT**

CONSUMER LITIGATION LAW CENTER, APC

CONSUMER LITIGATION LAW CENTER, APC

1   modification for which they are qualified based on Defendants' acts and

2   omissions, and are facing an improper foreclosure sale due to Defendants.

3       134.   Defendants' acts proximately caused Plaintiffs' harm because, as a

4   result of Defendants interference between Plaintiffs and the beneficiary, Plaintiffs

5   have incurred extensive penalties, an excessive mortgage payment, default, and

6   threatened loss of the Subject Property.

7       135.   Based on Defendants' negligent acts and omissions as alleged

8   hereinabove, Plaintiffs are entitled to general and special damages in an amount to

9   be proven at time of trial but in any event no less than the jurisdictional minimum

10  of this Court.

11      136.   Plaintiffs are further entitled to punitive damages to punish and deter

12  Defendants from such outrageous, reckless conduct and to deter other lenders,

13  servicers, and originators who are likely to commit similarly reckless acts and

14  omissions in the future.

15      137.   Plaintiffs are therefore entitled to such relief as is set forth in this

16  Cause of Action and to such further relief set forth below in the section captioned

17  Prayer for Relief which is by this reference incorporated herein.

**TENTH CAUSE OF ACTION**

**FAILURE TO ENGAGE IN LOSS MITIGATION**

**(Cal. *Civ. Code* § 2923.5)**

**(Against Defendants U.S. Bank, SLS, Zieve and DOES 1-25)**

22      138.   Plaintiff hereby realleges and incorporates by reference all preceding

23  paragraphs as though fully set forth herein.

24      139.   California *Civil Code* section 2923.5(a)(2) requires that the **mortgage**

25  **servicer, trustee, or beneficiary contact the borrower in person or by phone**

26  to discuss options to avoid foreclosure and schedule a subsequent meeting within

27  fourteen (14) days if the borrower so requests, as well as the telephone number to

28  locate a HUD-certified counseling agency.  Cal. *Civ. Code* § 2923.5(a)(2).

**VERIFIED FIRST AMENDED COMPLAINT**

CONSUMER LITIGATION LAW CENTER, APC

140.   Plaintiffs are informed, believes, and thereon alleges that prior to recording the NOD on the Subject Property, SLS never initiated contact with Plaintiffs in person or by phone to discuss any options to avoid foreclosure, never scheduled a subsequent meeting with Plaintiffs, never provided Plaintiff with HUD's telephone number, and never provided the telephone number to locate a HUD-certified counseling agency.

141.   Contrary to Defendants' obligation to assess Plaintiffs' financial situation to avoid foreclosure, once Plaintiffs contacted SLS to discuss loss mitigation, SLS purported "single point of contact" failed to timely contact Plaintiffs, and, in fact, Plaintiffs were shuffled through thirty different points of contact at SLS. SLS constantly gave Plaintiffs false or inconsistent status updates regarding their loan modification application, and habitually lost documents over and over despite the fact that Plaintiffs promptly provided all documents requested. Rather, Plaintiffs contacted many of Defendants' representatives who repeatedly asked for the same information from Plaintiff over and over again, only to deny Plaintiff a loan modification on the grounds of missing documents that Plaintiffs had in fact provided to Defendants.

142.   SLS also stated that Plaintiffs received a second loan modification, only to deny this claim several days later. SLS also failed to properly account for Plaintiffs' change in income when SLS denied Plaintiff for a modification—even though SLS originally stated that Plaintiffs were approved for a second modification. Moreover, SLS similarly offered Plaintiffs a reinstatement plan only to again deny the existence of any forbearance plan a short time later.

143.   California *Civil Code* section 2923.5(e) requires that before recording a NOD on a property in foreclosure, the mortgage servicer, trustee, or beneficiary must conduct "due diligence" to contact the borrower. Cal. *Civ. Code* § 2923.5(e). "Due diligence" requires that the mortgage servicer, trustee, or beneficiary send a first-class letter including the toll-free telephone number to

locate a HUD-certified counseling agency, that the servicer follow up by phone on three occasions at three different hours on different days, and that the servicer send a certified letter, return receipt requested if the borrower does not respond to the phone calls in two weeks.  Cal. *Civ. Code* § 2923.5(e)(2)–(3).

144.    The servicer, trustee, or beneficiary of the mortgage shall not record a NOD until thirty (30) days after it has satisfied the requirements of California *Civil Code* section 2923.5.  Cal. *Civ. Code.* § 2923.55(a).

145.    Plaintiff is informed, believes, and thereon alleges that Defendants, and each of them, failed to satisfy the contact and notice requirements of California *Civil Code* section 2923.5 in that Defendants failed to contact Plaintiffs to discuss options to avoid foreclosure, failed to set up a follow up appointment with Plaintiffs, failed to provide Plaintiffs with HUD's telephone number to find a certified counseling agency, failed to mail a letter to Plaintiffs with said phone number, failed to call Plaintiffs at three times on three different days, and failed to send a certified letter to Plaintiffs with return receipt requested.

146.    On or about April 12, 2011 Defendants initiated a non-judicial foreclosure proceeding on Plaintiff's residence when SLS, through its alleged trustee, Zieve, recorded a NOD on the Subject Property.

147.    Thus, Defendants did not fulfill the substantive obligations imposed upon them, as Lenders, by the legislature prior to the recording of the NOD.  In fact **Defendants told Plaintiffs that they had to default on their original Loan Agreement to even begin loan modification review**.  These instructions are in direct contradiction to California *Civil Code* section 2923.5.

148.    The NOD should not have been recorded, and the recordation violated California *Civil Code* section 2923.55.  No NOD should have been recorded prior to a good faith effort being made by Defendants to contact Plaintiffs and explore alternatives to foreclosure.

/ / /

CONSUMER LITIGATION LAW CENTER, APC

**VERIFIED FIRST AMENDED COMPLAINT**

CONSUMER LITIGATION LAW CENTER, APC

149.    This violation makes the foreclosure and any subsequent trustee's sale of the Subject Property wrongful, improper, and illegal under California law.

150.    Defendants' actions were against public policy because the legislature enacted this provision of the *Civil Code* to slow the process of so that foreclosures could be avoided.

151.    As a result of these wrongful acts and omissions, Plaintiffs have been precluded from benefiting from the rights granted by *Civil Code* sections 2924(b) and 2923.5, in being contacted by her lender, servicer, or trustee with due diligence in an attempt to modify the Loan Agreement to a principal amount and an interest rate which he could not only afford, but would allow him to stay in her home.

152.    Plaintiffs are therefore entitled to injunctive relief prohibiting Defendants from exercising the power of sale in violation of *Civil Code* section 2923.5 and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## ELEVENTH CAUSE OF ACTION

### REFORMATION OF A FRAUDULENT CONTRACT AND RESTITUTION

### (Cal. *Civ. Code* §§ 1670.5, 1667, 1689, 3412)

### (Against Defendants B.F. Saul, U.S. Bank, SLS, and DOES 1-25)

153.    Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

154.    A contract may be rescinded "(1) If the consent of the party rescinding . . . was . . . obtained through . . . fraud, or [or] . . . (5) [i]f the contract is unlawful for causes which do not appear in its terms or conditions, and the parties are not equally at fault [or] . . . (6) [i]f the public interest will be prejudiced by permitting the contract to stand." Cal. *Civ. Code* § 1689(b).

155.   In like manner "[a] written instrument, in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon his application, be so adjudged, and ordered to be delivered up or canceled." Cal. *Civ. Code* § 3412.

156.   California *Civil Code* section 1670.5 provides in relevant part, "[i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time that it was made the court may refuse to enforce the contract . . . ." Cal. *Civ. Code* § 1670.5.

157.   As discussed hereinabove, the Loan Agreement marketed, originated, and later serviced by Defendants, was unconscionable because: (1) the loan was predatory in nature because it included undisclosed negative amortizations and in introductory teaser rate that was not the true starting interest rate; (2) the loan contained terms for the adjustable increase in the amount of interest to be paid, and by extension, the amount of the monthly mortgage payments that were to be paid over the term of the loan, without regard to the ability of Plaintiff to be able to pay the increased payments upon adjustment, thus setting Plaintiff up for likely or certain default and inevitable foreclosure in contravention of government policies favoring home ownership and disfavoring foreclosure; and (3) the monthly payment was certain to increase because the Loan Agreement contained a cap on the maximum amount the principal balance could grow, thus once negative amortization caused the loan to meet the maximum allowable principal balance, the monthly payment would suddenly increase to allow for fully amortized payments that were completely unknown and undisclosed to Plaintiffs, yet certain to occur due to the initial negative amortization.  Such unconscionable acts by were and are in violation of California *Civil Code* sections 1596, 1708 and 1709, as the Loan Agreement was injurious not only to Plaintiffs, but also to the public at large, and was deceptive for the reasons stated above.

/ / /

158.   It was reasonably foreseeable by B.F. Saul that such egregious contract terms would cause Plaintiffs to default—besides the fact that SLS instructed Plaintiffs to default—thereby resulting in economic injury to Plaintiffs. Said injury includes loss of home improvements, excessive fees and mortgage payments, relocation costs, credit damage, loss of equity, and emotional distress associated with the impending foreclosure.   The combination of negative amortization and a cap on the maximum principal balance leading to a readjustment of monthly payments did in fact lead Plaintiffs to default, in violation of California public policy. See California *Civil Code* § 1711.

159.   Plaintiffs also contend that the Loan Agreement originated by B.F. Saul and later assumed by co-Defendants was procured by fraud and therefore illegal, void, and unenforceable.   The Loan Agreement is also void as it violates numerous California statutes pursuant to *Civil Code* section 1667.   Plaintiffs allege that Defendants and each of them violated the following statutes: *Civil Code* sections 1572, 1573, 1596, 1670.5, 1709, 1710 and *Business & Professions Code* sections 17200 et seq.

160.   Based on the above referenced violations of California law, and pursuant to the equitable remedy of reformation authorized by the *Commercial Code* in cases of fraud in the inducement of a contract, Plaintiffs seek reformation of the Loan Agreement to properly reflect the meeting of the minds as to the true terms of the agreement that Plaintiffs rightfully believed to be the basis of the Loan Agreement.   Based on such reformation, Plaintiffs seek restitution of all monies paid pursuant to the Loan Agreement, including earnest money, all closing costs, all principal, interest, and taxes paid prior to default that exceed of the terms of the properly reformed agreement, to be proven at time of trial.

161.   Plaintiffs are entitled to such relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief, which is by this reference incorporated herein.

**VERIFIED FIRST AMENDED COMPLAINT**

CONSUMER LITIGATION LAW CENTER, APC

# TWELFTH CAUSE OF ACTION

## QUIET TITLE

### (Cal. Code Civ. Proc. § 760.020)

**(Against Defendants and All Persons Unknown, Claiming Any Legal Or Equitable Right, Title, Estate, Lien, Or Interest In The Property Described In The Complaint Adverse To Plaintiff's Title Or Any Cloud On Plaintiff's Title Thereto, and DOES 1 through 25)**

162.   Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

163.   Plaintiffs are the legal owners of the Subject Property that is commonly known as 3811 River Avenue, Newport Beach, California 92663.[2]

164.   Plaintiffs seek to quiet title as of April 12, 2013, the date the first NOD was recorded.

165.   Plaintiffs seeks to quiet title against the claims of all Defendants named in this Complaint and anyone else claiming interest in the Subject Property.  Defendants and any successors or assignees have no right to title or interest in the Subject Property and no right to entertain any such rights of ownership including the right of possession.

166.   In addition, Plaintiffs contend that defendant Zieve did not have the authority or right to file the NOD recorded on April 12, 2013, since the Substitution of Trustee dated September 22, 2012, purportedly substituting the former trustee Chevy Chase Bank, F.S.B. for the purported current trustee Zieve was ineffective.  As alleged hereinabove, U.S. Bank had no authority to authorize the Substitution of Trustee because the Subject Loan was not securitized into the

---

[2]  Legal Description: Lot 8 in Block 138 of River Section, in the City of Newport Beach, County of Orange, State of California, as per map recorded in Book 4, Page(s) 25 of Miscellaneous Maps, in the officer of the County Recorder of said County.
APN: 423-308-01

**VERIFIED FIRST AMENDED COMPLAINT**

CONSUMER LITIGATION LAW CENTER, APC

Chevy Chase Funding LLC Mortgage Backed Certificates Series 2007-2 before said Mortgage Trust closed.  Such Substitution of Trustee should be declared void *ab initio* along with any NOD recorded thereafter because Zieve was not validly substituted as trustee of record and, therefore, Defendants do not have a right to foreclose on the Subject Property.

167.  Plaintiffs seek a judicial declaration that the title to the Subject Property is vested in Plaintiff alone as the title owner of the Subject Property, and that Defendants and each of them be declared to have no estate, right, title, or interest in the Subject Property, and that Defendants, their agents, and assigns, be forever enjoined from asserting any estate, right, title or interest in the Subject Property.

168.  As Defendants do not have any legal ownership or interest in the Subject Property on the date of foreclosure, allegedly obtained the Subject Property through fraud and wrongful conduct, and failed to adhere to the strict statutory requirements to effectuate a foreclosure sale of the Subject Property, the foreclosure sale proceedings are void and invalid.  Therefore, Plaintiffs still have title to the Subject Property.

169.  Tender of the full outstanding debt is not required to quiet title in favor of Plaintiffs.  There is no bright-line rule requiring tender of the unpaid debt to set aside a sale.  *Storm* v. *America's Servicing Company* (S.D.Cal. Nov. 6, 2009, No. 09CV1206-IEG (JMA)) 2009 WL 3756629 at *6 fn. 9.  Tender is a "matter of discretion left up to the Court." *Id.* at *6.  Even if tender were expressly required anywhere, there is no requirement that tender be pled because "at the procedural stage the Court only decides whether the plaintiff has pleaded "enough facts to state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atlantic Corp.* v. *Twombly* (2007) 550 U.S. 544, 547).  Furthermore, requiring Plaintiffs to allege tender would affirm the underlying debt and invalidate Plaintiffs claims. See *Onofrio v. Rice* (1997) 55 Cal. App. 4th 413, 424.

CONSUMER LITIGATION LAW CENTER, APC

**VERIFIED FIRST AMENDED COMPLAINT**

CONSUMER LITIGATION LAW CENTER, APC

Plaintiff's claims for fraud and unfair and deceptive acts challenge the underlying debt. In addition, the general equitable exception to the tender rule should be applied as such a requirement would evidence injustice and a hardship. *Humboldt Sav. Bank v. McCleverty* (1911) 161 Cal. 285, 291.

170. Accordingly, the Court should rule that title to the Subject Property be vested in Plaintiffs' names alone and award consequential damages in an amount to be proven at trial.

## THIRTEENTH CAUSE OF ACTION
## DECLARATORY RELIEF
### (Cal. *Code Civ. Proc.* § 1060)

### (Against Defendants SLS, Zieve, U.S. Bank, and DOES 1-25)

171. Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

172. An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their respective rights and duties regarding the Loan Agreement, the foreclosure process, and the pending trustee's sale.

173. These disputes concern, but are not limited to, the ownership rights to the Subject Property and the validity of the foreclosure process and trustee's sale.

174. Plaintiffs contend that pursuant to the Loan Agreement, Defendants do not have authority to foreclose upon and sell the Subject Property.

175. In addition, Plaintiffs are informed, believe, and thereon allege that Zieve did not have authority or right to file the NOD recorded on April 12, 2013, since the September 22, 2102 Substitution of Trustee was authorized by U.S. Bank as the trustee for the Mortgage Trust described hereinabove, but that the Subject Loan was not placed or collateralized in the Mortgage Trust. Therefore, Zieve had no authority to record the NOD or any subsequent NTS and neither the NOD nor any NTS have authority over the Loan Agreement or Subject Property.

**VERIFIED FIRST AMENDED COMPLAINT**

1   As such, the Substitution of Trustee substituting Chevy Chase Bank, F.S.B. for the

2   current trustee, Zieve, should be declared void and invalid.

3        176.   Plaintiffs are informed, believe, and thereon allege that Defendants

4   dispute Plaintiffs' position as alleged herein and take the contrary position that

5   they do in fact have the legal right and authority to foreclose on the Subject

6   Property.

7        177.   As a result of said dispute, Plaintiffs request a judicial determination

8   of the rights, obligations, and interest of the parties as to the Subject Property, and

9   such determination is necessary and appropriate at this time, and under these

10  circumstances, so that all parties may ascertain and know their rights, obligations,

11  and interest in the Subject Property.

12       178.   As a result of Defendants' wrongful foreclosure proceedings,

13  Plaintiff will sustain great and irreparable injury through the permanent loss of the

14  Subject Property.  Plaintiffs cannot obtain adequate relief from money damages

15  because real property is unique; thus, Plaintiffs lack an adequate remedy at law.

16       179.   Plaintiffs request a determination of the validity of the Substitution of

17  Trustee dated September 22, 2012.

18       180.   Plaintiffs request a determination of the validity of the NOD recorded

19  on April 12, 2013.

20       181.   Plaintiffs request a further determination of whether any Defendant

21  has authority to foreclose and to conduct a trustee's sale on the Subject Property.

22                      **PRAYER FOR RELIEF**

23       WHEREFORE, Plaintiffs pray for judgment against Defendants, and each

24  of them, as follows:

25  1.  To enjoin the trustee's sale of the Subject Property;

26  2.  For compensatory damages awarded according to proof;

27  3.  For special damages according to proof;

28  ///

**VERIFIED FIRST AMENDED COMPLAINT**

CONSUMER LITIGATION LAW CENTER, APC

4. For punitive damages sufficient to punish the Defendants and act as a deterrent to others;

5. For rescission of the Loan Agreement and restitution of all principal and interest paid by Plaintiffs as well as any and all costs and fees Plaintiffs paid pursuant to the Loan Agreement;

6. For all applicable statutory damages;

7. For attorney's fees and costs of suit incurred herein;

8. For pre- and post-judgment interest thereon; and

9. For such other and further relief as the court deems just and proper.

Dated: February 5, 2014                Consumer Litigation Law Center, APC

                                       By: _____
                                           September J. Katje, Esq.
                                           Jeffrey J. Ogorek, Esq.
                                           Attorneys for Plaintiffs,
                                           GARY R. KOLLER and
                                           CYNTHIA D. KOLLER

CONSUMER LITIGATION LAW CENTER, APC

38

**VERIFIED FIRST AMENDED COMPLAINT**

## VERIFICATION

I, Gary R. Koller, am a Plaintiff in this action. I have read the Verified First Amended Complaint and the facts and allegations contained therein are true to the best of my knowledge, except as to those matters stated on information and belief, and, as to those matters, I believe them also to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Newport Beach, California on February 4, 2014.

Gary R. Koller

## VERIFICATION

I, Cynthia D. Koller, am a Plaintiff in this action. I have read the Verified First Amended Complaint and the facts and allegations contained therein are true to the best of my knowledge, except as to those matters stated on information and belief, and, as to those matters, I believe them also to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Newport Beach, California on February 4, 2014.

Cynthia D. Koller

CONSUMER LITIGATION LAW CENTER, APC

**VERIFIED FIRST AMENDED COMPLAINT**

# EXHIBIT A



**SLS**
Specialized Loan Servicing, LLC

8742 Lucent Blvd.
Suite 300
Highlands Ranch, CO 80129
1-800-315-4SLS (4757)

| Account Number | Statement Date |
|---|---|
| 1004706217 | 02/24/10 |
| 1st Mortgage | |
| Property Address | |
| 3811 Riv Ave | |
| Newport Beach CA 92663 | |

+ 0277572 000005262 04SLS2 0046841 P1 P7

Gary R Koller Sr
3811 River Ave
Newport Beach CA 92663-2952

||..||..|||.||..||.||..||.|.||.||.|..||.|..|.||..||.|.||..|.||

## WELCOME TO SPECIALIZED LOAN SERVICING, LLC

**Your Option ARM Loan**
It is our pleasure to welcome you as a customer of Specialized Loan Servicing, LLC. Effective 03/01/2010 the servicing of your loan has been transferred from Capital One, N.A. to us. Specialized Loan Servicing is pleased to be the new servicer of your Option ARM loan. We also wish to assure you that the terms and conditions of this transfer will not affect any original loan documents other than the terms directly related to the servicing of your loan.

As your Option ARM loan provider, Specialized Loan Servicing is committed to courteous and responsive service, accurate and timely handling of your payments, and simple, direct answers to your questions. For prompt response in all communications with us, please remember to reference your account number 1004706217.



**Payment Procedures**
Beginning 03/01/2010, all future payments should be mailed to Specialized Loan Servicing. Your previous lender will not accept payments from you beginning on the date listed above. Attached is your first payment coupon. Beginning next month you will receive a monthly billing statement.

If your monthly payment includes additional funds for the payment of taxes and insurance, please refer to the General Tax and Insurance sections on page 2 of 4 of this statement.

## HOW TO CONTACT SLS

**For up-to-the-minute information about your account, use our 24-hour automated information system.** To ask about this statement or general up-to-the-minute account information, please call 1-800-315-4SLS (4757), Monday - Friday 6a.m. -6p.m. MST. TDD: 1-800-268-9419, Monday - Friday 8:00 a.m. to 5:00 p.m. MST. Se Habla espanol - 1-800-315-4SLS (4757).

Or write to us at:

| | |
|---|---|
| General Customer Service Inquiries: | P.O. Box 636005<br>Littleton, CO 80163-6005 |
| Tax Department: | P.O. Box 5515<br>Pasadena, CA 91107-0515<br>Attn: Tax Process<br>Phone: 1-866-801-1373 |
| Insurance Department: | P.O. Box 11023<br>Orange, CA 92856-8023<br>Phone: 1-800-441-4145 |
| Payments: | Attn: Remittance Processing<br>P.O. Box 105219<br>Atlanta, GA 30348-5219 |
| Overnight Deliveries: | 8742 Lucent Blvd., Suite 300<br>Highlands Ranch, CO 80129 |

Our Website - www.sls.net

How to reach your previous lender:
Capital One, N.A.
7501 Wisconsin Avenue
West Tower, 6th Floor
Bethesda MD 20814
888-497-6278
(If not a toll free number, you may call collect.)

Detach and return with payment

---

**SLS**
Specialized Loan Servicing LLC
P.O. Box 636005
Littleton, CO 80163-6005
1-800-315-4SLS (4757)

| Account Number |
|---|
| 1004706217 |
| 1st Mortgage |

A fee up to $25.00 will be charged for each returned payment except as otherwise limited by law.

**PAYMENT INSTRUCTIONS**

1. Please
   - Do not send cash
   - Do not staple your check to the payment coupon
   - Do not include correspondence
2. Write your account number on your check or money order.
3. Write in any additional amounts you are including. (If the total is more than $5,000, please send certified check.)
4. Make your check payable to
   Specialized Loan Servicing
   Attn: Remittance Processing

**Minimum Payment Amount      $5822.90**

The amount shown above is taken from preliminary data and represents the minimum payment only. Your current billing statement will be mailed within 7 business days. That statement will contain all of your payment information along with a return envelope for your payment. If you do not receive your statement, please call our customer care center at the number listed above.

Specialized Loan Servicing, LLC
PO Box 105219
Atlanta, GA 30348-5219

|..|||||..||.|.|.||.||.|.|.||.|.||..|||.|...|||.|..||.|

10047062175000000000000000000005822900

**SLS**
Specialized Loan Servicing, LLC

8742 Lucent Blvd.
Suite 300
Highlands Ranch, CO 80129
1-800-315-4SLS (4757)

**Account Number**
1004706217
1st Mortgage
Property Address
3811 Riv Ave
Newport Beach CA 92663

**Statement Date**
02/24/10

## General Tax and Insurance Information

Your monthly home loan payment may include an amount to be deposited into an escrow or impound account from which we pay the insurance and/or taxes. We may review this account during the first 12 months to ensure that our monthly payment to this account is appropriate.

1. Any property tax bill sent directly to you should be forwarded immediately to Specialized Loan Servicing Tax Department, so that you can be assisted in avoiding penalties incurred by late payments. Also, you should be sure that you have applied for all money-saving tax exemptions available through your tax authority.
2. The terms of your mortgage loan require that you maintain insurance coverage for at least the amount of the outstanding balance of your loan, or 100% of the insurable value of the improvements. It also must show Specialized Loan Servicing in the mortgage clause. You can have an active part in determining your monthly escrow payment by verifying with your insurance agent the exact amount of insurance you need to carry, and reminding them that your renewal policy must be sent directly to us well before the renewal date. Without a policy in our office within fifteen days prior to the renewal date, we may have to place coverage with an agent of our choice to protect our security interest. Any insurance correspondence should be forwarded immediately to Specialized Loan Servicing Insurance Department.
3. If you wish to make a mid-term insurance policy substitution, you are responsible for canceling the previous policy and paying the new carrier. You must send us a copy of the cancellation notice for the prior policy, a copy of the new policy with the appropriate mortgagee clause and a paid receipt for the first year's premium.
4. We encourage you to contact your insurance company immediately to verify that your policy reflects Specialized Loan Servicing, LLC as your new loan servicer. Your mortgage clause must read as follows: "Specialized Loan Servicing, LLC, its successors and/or assigns." Please also provide your agent with your new account number and Specialized Loan Servicing address.
5. To monitor this escrow account, we perform an escrow analysis annually; resulting in a payment adjustment based on the most recent amounts paid for taxes and insurance. The new payment will collect for the current year exactly what was previously paid out. Because we cannot anticipate the local tax increases or insurance costs, an increase in these factors will result in escrow changes and/or shortages.

## Additional Important Information

Optional Insurance – SLS does not currently offer life insurance or disability insurance. If you were previously enrolled in this service, it will no longer be part of your monthly payment. You should contact your provider to arrange for payment or cancellation of this service.

End of Year Statements - Every year, in January, we will send you an accounting of your loan for the previous calendar year along with a statement of taxes and interest paid for income taxes purposes. Please be sure to keep us advised of any change in your mailing address.

## Important Messages

For your protection, please be advised that we are attempting to collect a debt and any information obtained will be used for that purpose. Calls will be monitored and recorded for quality assurance purposes. If you do not wish for your call to be recorded, please notify the customer service associate when calling.

Attention to any Customer in Bankruptcy or who has received a bankruptcy discharge of this debt: please be advised that this letter constitutes neither a demand for payment of the captioned debt nor a notice of personal liability to any recipient hereof who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code, however, it may be a notice of possible enforcement of our lien against the collateral property, which has not been discharged in your bankruptcy.

---

**PAYMENT INSTRUCTIONS**

Please

- Make your check payable to Specialized Loan Servicing
- Write your account number on your check or money order
- Write in any additional amounts you are including (if total is more than $5,000, please send certified check).

- Do not staple your check to the payment coupon
- Do not include correspondence
- Do not send cash

**Payments.** All accepted payments of principal and interest will be applied to the longest outstanding installment due, unless otherwise expressly prohibited or limited by law.

**Additional amounts.** If you submit an additional principal amount, an additional escrow amount and/or "other" amount with your regular home loan payment of principal and interest, SLS will first apply your loan payment before any additional amount is applied. If your home loan payments are not current, SLS will first apply any additional principal amount and/or additional escrow amount to outstanding principal and interest payments due before either additional amount is applied. Any additional amount specified as "other" will be applied first to past due principal and interest payments, then escrow deficiencies, then fees and costs due, then late charges, then outstanding principal.

**Avoid late payments.** Make your payment on or before the due date specified in your loan documents. If you don't have a billing statement, write your account number on your check or money order and submit it promptly to ensure we receive your payment before late charge becomes due. The payment address is located under How To Contact Us. To be sure that we always receive your payment on time, you can have it deducted automatically from your bank. For details call 1-800-315-4SLS (4757).

**Post-Dated checks.** SLS's policy is not to accept post-dated checks, unless specifically agreed to by a loan counselor or technician.



**SLS**
Specialized Loan Servicing, LLC

8742 Lucent Blvd.
Suite 300
Highlands Ranch, CO 80129
1-800-315-4SLS (4757)

| Account Number | Statement Date |
|---|---|
| 1004706217 | 02/24/10 |
| 1st Mortgage | |
| Property Address: | |
| 3811 Riv Ave | |
| Newport Beach CA 92663 | |

## NOTICE OF ASSIGNMENT, SALE, OR TRANSFER OF SERVICING RIGHTS

Welcome to Specialized Loan Servicing, LLC. It is our pleasure to welcome you as a customer. Your home loan servicing was recently transferred to us and this is your official notice of the transfer, as legally required. Your home loan was previously serviced by Capital One, N.A. and you officially became a Specialized Loan Servicing, LLC customer effective 03/01/2010. Going forward, Specialized Loan Servicing will handle the servicing of your home loan, which means collecting your monthly home loan payments and handling related issues. Please note the terms and conditions of your mortgage loan documents do not change in any way, other than terms directly related to the servicing of your home loan.

Except in limited circumstances, the law requires that your present servicer send you a notice at least 15 days prior to the effective servicing transfer date, which is also the date in which your first payment is due to Specialized Loan Servicing. Your present servicer may have provided this notice as part of your loan closing documents. If this is the case, please note that your first payment will be due to Specialized Loan Servicing. Specialized Loan Servicing must also send you this transfer notice no later than 15 days after the transfer date, which is why you are receiving this notice as part of your welcome package.

The date that Capital One, N.A. will stop accepting payments from you is 03/01/2010. All payments due on or after 03/01/2010 should be sent to Specialized Loan Servicing. Your payment options are listed below.

Finally, we want to make you aware of certain rights you have under RESPA. A summary is provided at the bottom of this notice.

## ABOUT YOUR RIGHTS UNDER "RESPA"

You should be aware of your rights as a consumer with a home loan. These are explained in detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA)(12 U.S.C. 2605). Some of the highlights are as follows:

If during the first 60 days after your first payment is due to Specialized Loan Servicing, you mistakenly send your payment to Capital One, N.A., Specialized Loan Servicing is not allowed to charge you a late fee, or to report you to the credit bureau during the 60 day period stated above.

If you send a "qualified written request" to Specialized Loan Servicing concerning the servicing of your loan, we must provide you with a written acknowledgement within 20 Business Days of the receipt of your request. A "qualified written request" is a written correspondence which includes your name and account number and your reasons for the request. Writing a note on your payment coupon or envelope is not considered a "qualified written request". Inquiries or information sent to us via our website is not considered a "qualified written request". Qualified written request must be sent to:

Attn: Customer Care Support
P.O. Box 636005
Littleton, CO 80163-6005

Specialized Loan Servicing has 60 Business Days after receiving your request to make any appropriate corrections to your account. We must provide you with a written clarification about any dispute about your account. During this 60 Business Day period, we may not provide information to a consumer reporting agency concerning any overdue payment related to your qualified written request. However, this does not prevent us from initiating foreclosure if proper grounds exist under your loan documents.

A Business Day is any day excluding legal public holiday (state or federal), Saturday or Sunday.

---

### IMPORTANT PAYMENT OPTIONS INFORMATION FOR YOUR RECORDS

**Address Payment To:**
Specialized Loan Servicing
P.O. Box 105219
Atlanta, GA 30348-5219

**Regular Payment Instructions:**
- For payments made by regular mail, and in proper form, please allow 10 days for processing.
- Payments received on a business day prior to 9:00 p.m. EST and in proper form will be effective dated and processed as of the date of receipt.

**Avoid Delays in Payment Processing:**
- Always mail the payment in proper form, which is with coupon in window envelope provided, writing your account number on the check. Failure to do any of these steps may result in a delay in posting. DO NOT SEND CASH.
- Do not send correspondence with your payment. Send all correspondence to the address listed on this statement.
- In the event that you do not receive your monthly billing statement, DO NOT DELAY PAYMENT. Write your account number on your check and mail it to the payment address provided in this statement. Payments must be sent in proper form to avoid a delay in processing.

**Payment Options:**
- Monthly automatic draft - it's fast and easy, just call our Customer Care Center today and sign up.
- Visit our web site and pay on line. There is a fee for this service. Payment received prior to 6:00 p.m. MST will be effective dated the same day.
- Pay by phone. You may use our automated service by calling the Customer Care Center or by speaking with a Customer Care associate. There is a fee for this service. Payments received by 6:00 p.m. MST will be effective dated the same day.
- Payments sent via certified mail or overnight must be sent to the address on this statement. Failure to do so may result in a delay of posting.

©2004 Specialized Loan Servicing Trade/service marks are the property of Specialized Loan Servicing, LLC and/or its subsidiaries

# EXHIBIT B

ᶠIDELITY NATIONAL TITLE

Recording Requested By:

Return To:
Document Control Dept.
7501 Wisconsin Avenue
Bethesda, MD 20814

Prepared By:
Allison Rivers, Loan Closer
B. F. Saul Mortgage Company
333 South Anita Drive
ORANGE, CA 92868

Recorded in Official Records, Orange County
Tom Daly, Clerk-Recorder

|||||||||||||||||||||||||||||||||||||||||||   **72.00**

**2007000293050 04:12pm 05/04/07**
104 79 D11 23

0.00 0.00 0.00 0.00 66.00 0.00 0.00 0.00

———————————————————[Space Above This Line For Recording Data]———————————————————

## DEED OF TRUST

MIN **1000153-0567013321-8**

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated April  19, 2007
together with all Riders to this document.
(B) "Borrower" is  GARY R. KOLLER AND CYNTHIA D. KOLLER, HUSBAND AND WIFE AS
   JOT TENANTS

Borrower's address is 3811 RIVER AVENUE, Newport Beach, CA 92663
                                        . Borrower is the trustor under this Security Instrument.
(C) "Lender" is B. F. Saul Mortgage Company

Lender is a  corporation
organized and existing under the laws of  the State of Maryland

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3005  1/01

(VMP) -6A(CA) (0207).01
Page 1 of 15          Initials: _Clk/DR<_
    VMP Mortgage Forms, Inc.

15159972                                                567013321

Lender's address is 7501 Wisconsin Avenue, Bethesda, MD 20814

(D) "Trustee" is Chevy Chase Bank, F.S.B.

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated April 19, 2007
The Note states that Borrower owes Lender One Million Three Hundred Fifty Thousand and 00/100                                                                                          Dollars
(U.S. $ 1,350,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than May 1, 2037 .

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials: _____

VMP®-6A(CA) (0207).01                    Page 2 of 15                         Form 3005  1/01

15159972

567013321
MIN  1000153-0567013321-8

Order No. 30140610

# EXHIBIT "ONE" 

Lot 8 in Block 138 of River Section, in the City of Newport Beach, County of Orange, State of California, as per map recorded in Book 4, Page(s) 25 of Miscellaneous Maps, in the office of the County Recorder of said County.

Assessor's Parcel No: 423-308-01

2                                            (Rev. 11/17/04)

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
        County              of              Orange           :
        [Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

SEE ATTACHED EXHIBIT A

SUBJECT TO COVENANTS OF RECORD.

Parcel ID Number:                           which currently has the address of
3811 RIVER AVENUE                                        [Street]
         Newport Beach         [City], California 92663     [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

VMP® -6A(CA) (0207).01           Page 3 of 15      Initials:                Form 3005  1/01

15159972                                         567013321
                                  MIN  1000153-0567013321-8

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

-6A(CA) (0207).01                               Page 4 of 15                     Initials: _____        Form 3005  1/01

15159972

                                                                          567013321
                                                            MIN  1000153-0567013321-8

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

-6A(CA) (0207).01      Page 5 of 15      Initials:      Form 3005  1/01

15159972                     567013321

                 MIN   1000153-0567013321-8

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

VMP -6A(CA) (0207).01　　　　　　　　Page 6 of 15　　　　Initials: _____　　　　　　　Form 3005  1/01

15159972

567013321
MIN  1000153-0567013321-8

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6A(CA) (0207).01   Page 7 of 15   Initials:      Form 3005  1/01

15159972                     567013321
                 MIN  1000153-0567013321-8

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

VMP®-6A(CA) (0207).01                    Page 8 of 15                    Initials: _____          Form 3005   1/01

15159972                                                                                          567013321
                                                                        MIN   1000153-0567013321-8

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

-6A(CA) (0207).01        Page 9 of 15        Initials: _____        Form 3005   1/01

15159972                          567013321
                        MIN   1000153-0567013321-8

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

VMP®  -6A(CA) (0207).01                    Page 10 of 15          Initials: _____          Form 3005   1/01

15159972                                                                    567013321
                                                          MIN  1000153-0567013321-8

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

Initials: _____

-6A(CA) (0207).01                    Page 11 of 15                              Form 3005   1/01

15159972                                                                      567013321
                                                         MIN  1000153-0567013321-8

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

-6A(CA) (0207).01                         Page 12 of 15                         Initials:                    Form 3005  1/01

15159972                                                                                      567013321
                                                                   MIN   1000153-0567013321-8

ORANGE,CA                               Page 13 of 23                        Printed on 10/18/2013 5:06:55 PM
Document: TD 2007.293050

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

VMP -6A(CA) (0207).01                    Page 13 of 15          Initials: _____          Form 3005   1/01

15159972

567013321
MIN   1000153-0567013321-8

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _____ (Seal)
                                     GARY R. KOLLER              -Borrower

_____    _____ (Seal)
                                     CYNTHIA D. KOLLER          -Borrower

_____ (Seal)     _____ (Seal)
                    -Borrower                                    -Borrower

_____ (Seal)     _____ (Seal)
                    -Borrower                                    -Borrower

_____ (Seal)     _____ (Seal)
                    -Borrower                                    -Borrower

-6A(CA) (0207).01        Page 14 of 15            Form 3005  1/01

15159972                                         567013321
                                     MIN  1000153-0567013321-8

State of California
County of _Orange_              } ss.

On   _April 21, 2007_   before me, _Diana Alanis, Notary Public_

personally appeared

_Gary R. Koller, Cynthia D. Koller_

, ~~personally known to me~~
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by ~~his~~/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Diana Alanis_                    (Seal)

DIANA ALANIS
Commission # 1435081
Notary Public - California
Riverside County
My Comm. Expires Aug 15, 2007

-6A(CA) (0207).01        Page 15 of 15        Initials: _____        Form 3005   1/01

15159972                                                    567013321
                                        MIN   1000153-0567013321-8



567013321
MIN  1000153-0567013321-8

# ADJUSTABLE RATE NOTE
### (5 Year Payment Option / 1 Month LIBOR Index / Payment and Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. INCREASES AND DECREASES TO MY MONTHLY PAYMENT AND MY INTEREST RATE ARE LIMITED. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

| April 19, 2007 | TUSTIN | California |
|---|---|---|
| [Date] | [City] | [State] |

3811 RIVER AVENUE, Newport Beach, CA 92663
[Property Address]

1. BORROWER'S PROMISE TO PAY

   In return for a loan that I have received, I promise to pay One Million Three Hundred Fifty Thousand and 00/100 Dollars (U.S. $1,350,000.00) plus any amounts added in accordance with Sections 3 (C) and 3 (F) of this Note (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  B. F. Saul Mortgage Company. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by Transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2. INTEREST

   (A)  Interest Rate

   Interest will be charged on unpaid principal, including any deferred interest added to the unpaid principal (as described in Section 3 (C) below), until the full amount of principal has been paid. Until the first Interest Rate Change Date (as defined in Section 2 (B) below), I will pay interest at the yearly rate of  8.250%. The interest rate I will pay may change monthly.

   The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 8 (B) of this Note.

   (B)  Interest Rate Change Dates

   The interest rate I will pay may change on the first day of  June, 2007      , and  on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.

   (C)  Interest Rate Limits

   My interest rate will never be greater than 19.900%        . My interest rate will never be less than the Margin as set forth in Section 2 (E) below.

   (D)  The Index

   Beginning with the first Interest Rate Change Date, my interest rate will be based on an Index. The "Index" is the one month London Interbank Offered Rate (LIBOR) as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day after the twenty-fifth day of the month immediately preceding the month in which the Interest Rate Change Date occurs is called the "Current Index."

   If the Index or any Index previously substituted under this Section 2 (D) is no longer available, or is otherwise unpublished, the Note Holder may choose a new Index and a new Margin to result in a rate similar to the rate in effect at that time which is based upon comparable information. The Note Holder will give me notice of the choice.

   (E)  Calculation of Interest Rate Changes

   Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding Two and 950/1000       percentage points (  2.950%    ) (the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the interest rate limits stated in Section 2 (C) above, the rounded amount will be my new interest rate (the "Fully Indexed Rate") until the next Interest Rate Change Date.

3.   PAYMENTS

(A)   Time and Place of Payments

I will make my monthly payments, as described in Sections 3 (B) through 3 (F) below, on the first day of each month, but no sooner than thirty (30) days before each payment's due date, beginning on   June 1, 2007
. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on   May 1, 2037        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date." I will make my monthly payments at P.O. Box 17000, Baltimore, MD 21297-1000, or at a different place if required by the Note Holder.

(B)   Minimum Payment

As of the date of this Note, my initial required "Minimum Payment" is $   5,091.73.
Unless the maximum principal balance is reached as set forth in Section 3 (F) because of deferred interest, this amount will remain the same for the first 60 monthly payments due under this Note. Thereafter, my Minimum Payment is subject to change as described in detail below. Notwithstanding the payment options set forth in Section 3 (E) below, I must make at least the Minimum Payment each month. My initial required Minimum Payment was calculated to equal an amount that would have been sufficient to repay the unpaid principal I owe in full on the Maturity Date in substantially equal payments using a minimum payment rate of   2.150%
in lieu of the actual interest rate. This minimum payment rate is not the amount of interest that will be charged on my loan, but rather was used solely for calculating the initial required Minimum Payment.

(C)   Additions/Reductions to My Unpaid Principal

My initial and future required Minimum Payments may be less than the amount of the interest charged during that month. If I choose to make only the Minimum Payment when that amount is less than the interest due, the Note Holder will subtract the amount of my payment from the amount of the interest due and will add the difference to my unpaid principal. This difference is known as "Deferred Interest." The Note Holder also will charge interest each month on any Deferred Interest that continues to be part of my unpaid principal balance. The interest rate on the Deferred Interest added to principal will be the rate set forth in Section 2 of this Note.

(D)   Payment Changes

My Minimum Payment will change under the following circumstances:

(i)   Payment Change Dates.

My monthly Minimum Payment may change on the first day of June, 2012        , and on that same day every 12th month thereafter. Each of these dates is called a "Payment Change Date." Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay my unpaid principal in full on the Maturity Date in substantially equal installments at my new interest rate calculated pursuant to Section 2 (E) above. My new monthly Minimum Payment will be set equal to the recalculated amount except that my new Minimum Payment will not be more than 7.500 percent greater or less than the amount of the last monthly payment that was due before the applicable Payment Change Date.

(ii)   Adjustment Dates.

Notwithstanding Section 3 (D) (i) above, on the 1st Payment Change Date and on each 5th Payment Change Date thereafter, my Minimum Payment will be adjusted as explained above, except that the described 7.500 percent limitation will not apply.

(iii)   Other Changes.

My monthly payment may also change as described in Section (F) below.

(E)   Payment Options

Additional payment options, such as: (i) a fully-amortizing payment (i.e., a payment that would be sufficient to repay the unpaid principal balance in full on the Maturity Date in substantially equal installments at the current Fully Indexed Rate); (ii) an interest-only payment (i.e., a payment equal to the interest accrued on the principal balance at the Fully Indexed Rate); and, (iii) a 15-year amortization option, may, at the Note Holder's discretion, be shown on my monthly statement. These payment options are shown for my convenience and may change each month based on changes in the Index (as described in Section 2 (D) of this Note) and changes in the amount of my principal balance. Although none of these optional payments are required, a timely payment made in accordance with any payment option shown on my monthly statement will be deemed to be in compliance with the terms of this Note. In all events, a payment option offered on my monthly statement will never be less than my Minimum Payment.

5FXC25XX ( 115 ) Multistate        Rev. 7/3/06        Page 2 of 5
15159970

(F) Payment Limitations

In all events, my unpaid principal balance can never exceed a maximum of 115 percent of the principal amount I originally borrowed (the "Maximum Amount"). If, based upon the assumption that I will continue to make my current Minimum Payment, the Note Holder determines that making my current Minimum Payment will cause my unpaid principal balance to exceed the Maximum Amount, then the Note Holder may calculate a new monthly Minimum Payment to prevent my principal balance from doing this. Thereafter, until otherwise changed in accordance with the terms of this Note, my new monthly Minimum Payment will be a fully-amortizing payment calculated in accordance with Section 3(E)(i).

4.   NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my Minimum Payment before the effective date of any change. The notice will contain the interest rate or rates applicable to my loan for each month since the prior notice or, for the first notice, since the date of this Note, and the payment amount applicable to the loan. The notice will also include information required by law to be given to me, and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5.   FAILURE TO MAKE ADJUSTMENTS

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, after discovery of such failure, make the adjustment as if it had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid principal.

6.   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note. Unless otherwise stated in a Prepayment Penalty Addendum included in my loan documents, I may make a full Prepayment or partial Prepayments, without paying any Prepayment charge. The Note Holder will use all of my Prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, other amounts due and applicable fees before applying my Prepayment to reduce the principal that I owe under this Note. A partial Prepayment will not result in a change in the due dates of my monthly payments.

7.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges (the "Maximum Rate"), is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then, as my sole remedy (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial Prepayment.

8.   BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the late charge will be five percent (5%) of my overdue payment. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.



(D)  No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

9.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above, or at a different address if I give the Note Holder a notice in writing of my different address. Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3 (A) of this Note or at a different address if I am given a notice of that different address.

10.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

11.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

12.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of the Security Instrument.  Lender shall also not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in the Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.  Lender may also require the transferee to sign an Assumption Agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in the Security Instrument. Borrower will continue to be obligated under the Note and Security Instrument unless Lender releases Borrower in writing.  If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is

567013321
MIN   1000153-0567013321-8

delivered or mailed within which Borrower must pay all sums secured by the Security Instrument.  If the Borrower fails to pay these sums  prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

Witness the Hand(s) and Seal(s) of the Undersigned.

_____     4-2-07            _____
GARY R. KOLZER                       Date              Date

_____                       _____
                                     Date              Date

**THIS LOAN IS SUBJECT TO A PREPAYMENT PENALTY.   SEE ATTACHED PREPAYMENT PENALTY ADDENDUM TO NOTE**

5FXC25XX ( 115 ) Multistate        Rev. 7/3/06        Page 5 of 5
15159970

# ADJUSTABLE RATE RIDER
### (5 Year Payment Option / 1 Month LIBOR Index / Payment and Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 19th day of April 2007 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to B. F. Saul Mortgage Company(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

3811 RIVER AVENUE, Newport Beach, CA 92663
[Property Address]

THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. INCREASES AND DECREASES TO MY MONTHLY PAYMENT AND MY INTEREST RATE ARE LIMITED. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THE NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## 2. INTEREST
#### (A) Interest Rate
Interest will be charged on unpaid principal, including any deferred interest added to the unpaid principal (as described in Section 3 (C) below), until the full amount of principal has been paid. Until the first Interest Rate Change Date (as defined in Section 2 (B) below), I will pay interest at a yearly rate of 8.250% The interest rate I will pay may change monthly.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 8 (B) of the Note.

#### (B) Interest Rate Change Dates
The interest rate I will pay may change on the first day of June, 2007 and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.

#### (C) Interest Rate Limits
My interest rate will never be greater than 19.900% . My interest rate will never be less than the Margin as set forth in Section 2 (E) below.

Page 1 of 6

567013321    MIN    1000153-0567013321-8

SFXC25RD ( 115 )    Rev. 7/3/06
15159973

**(D) The Index**

Beginning with the first Interest Rate Change Date, my interest rate will be based on an Index. The "Index" is the one month London Interbank Offered Rate (LIBOR) as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day after the twenty-fifth day of the month immediately preceding the month in which the Interest Rate Change Date occurs is called the "Current Index."

If the Index or any Index previously substituted under this Section 2 (D) is no longer available, or is otherwise unpublished, the Note Holder may choose a new Index and a new Margin to result in a rate similar to the rate in effect at that time which is based upon comparable information. The Note Holder will give me notice of the choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding Two and 950/1000 percentage points ( 2.950% ) (the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the interest rate limit stated in Section 2 (C) above, the rounded amount will be my new interest rate (the "Fully Indexed Rate") until the next Interest Rate Change Date.

3.  **PAYMENTS**

(A) Time and Place of Payments

I will make my monthly payments, as described in Sections 3 (B) through (F) below, on the first day of each month, but no sooner than thirty (30) days before each payment's due date, beginning on June 1, 2007     . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under the Note. My monthly payments will be applied to interest before principal. If, on  May 1, 2037          , I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date." I will make my monthly payments at
P.O. Box 17000, Baltimore, MD 21297-1000
, or at a different place if required by the Note Holder.

(B) Minimum Payment

As of the date of the Note, my initial required "Minimum Payment" is
$ 5,091.73         . Unless the maximum principal balance is reached as set forth in Section 3 (F) because of deferred interest, this amount will remain the same for the first 60 monthly payments due under the Note. Thereafter, my Minimum Payment is subject to change as described in detail below. Notwithstanding the payment options set forth in Section 3 (E) below, I must make at least the Minimum Payment each month.

567013321      MIN   1000153-0567013321-8

5FXC25RD ( 115 )    Rev. 7/3/06
15159973

My initial required Minimum Payment was calculated to equal an amount that would have been sufficient to repay the unpaid principal I owe in full on the Maturity Date in substantially equal payments using a minimum payment rate of 2.150% in lieu of the actual interest rate. This minimum payment rate is not the amount of interest that will be charged on my loan, but rather was used solely for calculating the initial required Minimum Payment.

(C) Additions/Reductions to My Unpaid Principal

My initial and future required Minimum Payments may be less than the amount of the interest charged during that month. If I choose to make only the Minimum Payment when that amount is less than the interest due, the Note Holder will subtract the amount of my payment from the amount of the interest due and will add the difference to my unpaid principal. This difference is known as "Deferred Interest." The Note Holder also will charge interest each month on any Deferred Interest that continues to be part of my unpaid principal balance. The interest rate on the Deferred Interest added to principal will be the rate set forth in Section 2 of the Note.

(D) Payment Changes

My Minimum Payment will change under the following circumstances:

(i) Payment Change Dates.

My monthly Minimum Payment may change on the first day of June, 2012 , and on that same day every 12th month thereafter. Each of these dates is called a "Payment Change Date." Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay my unpaid principal in full on the Maturity Date in substantially equal installments at my new interest rate calculated pursuant to Section 2 (E) above. My new monthly Minimum Payment will be set equal to the recalculated amount except that my new Minimum Payment will not be more than 7.500 percent greater or less than the amount of the last monthly payment that was due before the applicable Payment Change Date.

(ii) Adjustment Dates.

Notwithstanding Section 3 (D) (i) above, on the 1st Payment Change Date and on each 5th Payment Change Date thereafter, my Minimum Payment will be adjusted as explained above, except that the described 7.500 percent limitation will not apply.

(iii) Other Changes.

My monthly payment may also change as described in Section (F) below.

Page 3 of 6

567013321    MIN    1000153-0567013321-8

5FXC25RD ( 115 )   Rev. 7/3/06
15159973



**(E) Payment Options**

Additional payment options, such as: (i) a fully-amortizing payment (i.e., a payment that would be sufficient to repay the unpaid principal balance in full on the Maturity Date in substantially equal installments at the current Fully Indexed Rate); (ii) an interest-only payment (i.e., a payment equal to the interest accrued on the principal balance at the Fully Indexed Rate); and, (iii) a 15-year amortization option, may, at the Note Holder's discretion, be shown on my monthly statement.  These payment options are shown for my convenience and may change each month based on changes in the Index (as described in Section 2 (D) of the Note) and changes in the amount of my principal balance.  Although none of these optional payments is required, a timely payment made in accordance with any payment option shown on my monthly statement will be deemed to be in compliance with the terms of the Note.  In all events, a payment option offered on my monthly statement will never be less than my Minimum Payment.

**(F) Payment Limitations**

In all events, my unpaid principal balance can never exceed a maximum of 115 percent of the principal amount I originally borrowed (the "Maximum Amount").  If, based upon the assumption that I will continue to make my current Minimum Payment, the Note Holder determines that making my current Minimum Payment will cause my unpaid principal balance to exceed the Maximum Amount, then the Note Holder may calculate a new monthly Minimum Payment to prevent my principal balance from doing this.  Thereafter, until otherwise changed in accordance with the terms of this Note, my new monthly Minimum Payment will be a fully-amortizing payment calculated in accordance with Section 3 (E) (i).

**4.  NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my Minimum Payment before the effective date of any change. The notice will contain the interest rate or rates applicable to my loan for each month since the prior notice or, for the first notice, since the date of the Note, and the payment amount applicable to the loan. The notice will also include information required by law to be given to me, and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.  FAILURE TO MAKE ADJUSTMENTS**

If for any reason Note Holder fails to make an adjustment to the interest rate or

Page 4 of 6

567013321      **MIN**   1000153-0567013321-8

5FXC25RD ( 115 )      Rev. 7/3/06
15159973



payment amount as described in the Note, regardless of any notice requirement, I agree that Note Holder may, after discovery of such failure, then make the adjustment as if it had been made on time.  I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid principal.

6.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

The Section of the Security Instrument titled "Transfer of the Property or Beneficial Interest in Borrower" is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of the Security Instrument.  Lender shall also not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in the Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an Assumption Agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and Security Instrument.  Borrower will continue to be obligated under the Note and Security Instrument unless Lender releases Borrower in writing.  If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

Page 5 of 6

567013321     .    MIN    1000153-0567013321-8

5FXC25RD ( 115 )      Rev. 7/3/06
1S159973

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

4-21-07
_____(Seal)
Date
GARY R. KODLER

_____(Seal)
Date

_____(Seal)
Date

_____(Seal)
Date

Page 6 of 6

567013321    MIN    1000153-0567013321-8

5FXC25RD ( 115 )    Rev. 7/3/06
15159973



# EXHIBIT C

RECORDING REQUESTED BY:

LSI Title Agency - FIS Default Solutions
Fidelity National Title

AND WHEN RECORDED MAIL TO:

Law Offices of Les Zieve
18377 Beach Blvd., Suite 210
Huntington Beach, California 92648

---

TS No.: **12-20780**

## SUBSTITUTION OF TRUSTEE

**WHEREAS, GARY R. KOLLER AND CYNTHIA D. KOLLER, HUSBAND AND WIFE AS JOT TENANTS** was the original Trustor, **CHEVY CHASE BANK, F.S.B.** was the original Trustee, and **B. F. SAUL MORTGAGE COMPANY, as Lender, Mortgage Electronic Registration Systems, Inc.** was the original Beneficiary under that certain Deed of Trust dated **4/19/2007** and recorded on **5/4/2007** as Instrument No. **2007000293050,** in book —, page — of Official Records of **Orange County, California**; and

**WHEREAS,** the undersigned is the present Beneficiary under said Deed of Trust, and

**WHEREAS,** the undersigned desires to substitute a new Trustee under said Deed of Trust in place and instead of said original Trustee, or Successor Trustee, thereunder, in the manner in said Deed of Trust provided,

**NOW, THEREFORE,** the undersigned hereby substitutes **Law Offices Of Les Zieve** , as Trustee under said Deed of Trust. Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

Dated:  **SEP 2 2 2012**

**U.S. Bank National Association, as Trustee relating to Chevy Chase Funding LLC Mortgage Backed Certificates Series 2007-2 by Specialized Loan Servicing LLC, attorney in fact**

**Michael Ward**
Second Assistant Vice President

State of **Colorado**   } ss.
County of  **Douglas**   }

On  _9 - 22 - 2012_  before me, _____ **Jeff  Plachko** _____ Notary Public, personally
appeared_____ _Michael Ward_____ who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of __**Colorado**____ that the foregoing
paragraph is true and correct.
WITNESS my hand and official Seal.

Signature _____(Seal)

JEFF PLACHKO
NOTARY
PUBLIC
STATE OF COLORADO
My Commission Expires
01-28-2013

NOTICE TO POTENTIAL BIDDERS: If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

NOTICE TO PROPERTY OWNER: The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call (714) 848-9272 or visit this Internet Web site www.elitepostandpub.com, using the file number assigned to this case 12-20780. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web site. The best way to verify postponement information is to attend the scheduled sale.

Dated:  12/13/2012            **Law Offices of Les Zieve, as Trustee**
                             **18377 Beach Blvd., Suite 210**
                             **Huntington Beach, California 92648**
                             **For Non-Automated Sale Information, call: (714) 848-7920**
                             **For Sale Information: (714) 848-9272   www.elitepostandpub.com**

                             **Christine O'Brien, Trustee Sale Officer**

THIS FIRM IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION WE OBTAINED WILL BE USED FOR THAT PURPOSE

# EXHIBIT   D

Recorded in Official Records, Orange County

Tom Daly, Clerk-Recorder

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖   **9.00**

**2011000271050 01:51pm 06/01/11**

65 404 A32 1

0.00 0.00 0.00 0.00 0.00 0.00 0.00 0.00

Requested and Prepared by:
Law Offices of Les Zieve

When Recorded Mail To:

Law Offices of Les Zieve
18377 Beach Blvd., Suite 210
Huntington Beach, California 92648

---

Loan No.: **1004706217**                                          TS No: **11-14248**

# ASSIGNMENT    *110197462*
## OF DEED OF TRUST

For Value Received, the undersigned corporation hereby grants, assigns, and transfers to:

**U.S. Bank National Association, as Trustee relating to Chevy Chase Funding LLC Mortgage Backed Certificates Series 2007-2**

all beneficial interest under that certain Deed of Trust dated: 4/19/2007 executed by GARY R. KOLLER AND CYNTHIA D. KOLLER, HUSBAND AND WIFE AS JOT TENANTS, as Trustor(s), to CHEVY CHASE BANK, F.S.B., as Trustee, and recorded as Instrument No. 2007000293050, on 5/4/2007, in Book --, Page -- of Official Records, in the office of the County Recorder of Orange County, California together with the Promissory Note secured by said Deed of Trust and also all rights accrued or to accrue under said Deed of Trust.

Dated:    **5-25-11**

By:   **Mortgage Electronic Registration Systems, Inc., as nominee for B. F. SAUL MORTGAGE COMPANY, its successors and assigns**

**Anthony Forsberg   Assistant Secretary**

State of   **Colorado**
County of   **Douglas**

On   **May 25, 2011**   before me,   **Marsha Corah**   , personally appeared,
**Anthony Forsberg**   who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of *Colorado*   that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.                                          (seal)

Signature
exp 7-8-2014



# EXHIBIT   E

RECORDING REQUESTED BY:

WHEN RECORDED MAIL TO:

**Law Offices of Les Zieve**
18377 Beach Blvd., Suite 210
Huntington Beach, California 92648

Recorded in Official Records, Orange County

Tom Daly, Clerk-Recorder

**15.00**

**2011000186908 04:04pm 04/12/11**

10 405 N15 3

0.00 0.00 0.00 0.00 6.00 0.00 0.00 0.00

---

Loan No.: 1004706217                          TS No.: 11-14248
APN: 423-308-01

# NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

## IMPORTANT NOTICE

# IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION, and you may have the legal right to bring your account in good standing by

paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until approximately 90 days from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is  __$27,919.72__  as of  __4/11/2011__  , and will increase until your account becomes current.  While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your Note and Deed of Trust or mortgage.  If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the Note and Deed of Trust or mortgage, the Beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing.  In addition, the Beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the Beneficiary or mortgagee will give you a written itemization of the entire amount you must pay.  You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your Beneficiary or mortgagee may mutually agree in writing prior to the time the Notice of Sale is posted (which may not be earlier than three months after this notice of default is recorded)  to, among other things. (1) Provide additional time in which to cure the default by transfer of the property or otherwise; or (2) Establish a schedule of payments in order to cure your default; or, both (1) and (2).

Loan No.: **1004706217**                    TS No. **11-14248**

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

**To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:**

**U.S. Bank National Association, as Trustee relating to Chevy Chase Funding LLC Mortgage**
**Backed Certificates Series 2007-2 c/o**
**Specialized Loan Servicing, LLC**
**C/O Law Offices of Les Zieve**
**18377 Beach Blvd., Suite 210**
**Huntington Beach, California 92648**
**Phone: (800)315-4757**

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure. **Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

NOTICE IS HEREBY GIVEN: That **Law Offices Of Les Zieve** is either the original Trustee, the duly appointed substituted Trustee, or acting as agent for the Trustee or Beneficiary under a Deed of Trust dated  4/19/2007, executed by **GARY R. KOLLER AND CYNTHIA D. KOLLER, HUSBAND AND WIFE AS JOT TENANTS,** as Trustor, **to secure certain obligations in favor of B. F. SAUL MORTGAGE COMPANY, A CORPORATION as Lender, Mortgage Electronic Registration Systems, Inc. as Beneficiary,** recorded 5/4/2007, as Instrument No. 2007000293050, in Book --, Page --,   of Official Records in the Office of the Recorder of  Orange County, **California** describing land therein as: **As more particularly described on said Deed of Trust.**

The subject obligation includes  **NOTE(S) FOR THE ORIGINAL** sum of **$1,350,000.00.**  A breach of, and default in,  the obligations for which such Deed of Trust is security has occurred in that payment has not been made of the following:
 **The monthly installment which became due on 1/1/2011, along with late charges, and all subsequent monthly installments.**

**You are responsible to pay all payments and charges due under the terms and conditions of the loan documents which come due subsequent to the date of this notice, including, but not limited to; foreclosure trustee fees and costs, advances and late charges.**

**Furthermore, as a condition to bring your account in good standing, you must provide the undersigned with written proof that you are not in default on any senior encumbrance and provide proof of insurance.**

**Nothing in this Notice of Default should be construed as a waiver of any fees owing to the beneficiary under the Deed of Trust, pursuant to the terms and provisions of the loan documents.**

Loan No.: **1004706217**                    TS No. **11-14248**

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

That by reason thereof, the present Beneficiary under such Deed of Trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such Deed of Trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

WE ARE ASSISTING THE BENEFICIARY TO COLLECT A DEBT AND ANY INFORMATION WE OBTAIN WILL BE USED FOR THE PURPOSE BY EITHER OURSELVES OR THE BENEFICIARY, WHETHER RECEIVED ORALLY OR IN WRITING. YOU MAY DISPUTE THE DEBT OR A PORTION THEREOF UPON WRITTEN REQUEST WITHIN THIRTY (30) DAYS. THEREAFTER WE WILL OBTAIN AND FORWARD TO YOU WRITTEN VERIFICATION THEREOF. SHOULD YOU NOT DO SO, THE DEBT WILL BE CONSIDERED VALID. IN ADDITION, YOU MAY REQUEST THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR IF DIFFERENT FROM THE CURRENT ONE.

**Attempts to contact the borrower have been unsuccessful. No contact was made with the borrower despite the due diligence of beneficiary of their authorized agent's pursuant to California Civil Code §2923.5(g), including, (a) mailing a first-class letter was sent to the borrower that included a toll-free contact number for the beneficiary as well as the toll-free telephone number for the United States Department of Housing and Urban Development (HUD) to find a HUD-certified housing counseling agency. In addition, at least three attempts were made to contact the borrower by telephone, followed-up by a certified letter, return receipt requested.**

**Dated: 4/11/2011**                    Law Offices Of Les Zieve, as Agent for Beneficiary

**Marco Marquez**

By LSI Title Company, As Agent

# EXHIBIT F

[RECORDING REQUESTED BY]
Law Offices of Les Zieve

[WHEN RECORDED MAIL TO:]
Law Offices of Les Zieve
18377 Beach Blvd., Suite 210
Huntington Beach, California 92648

Recorded in Official Records, Orange County
Renee Ramirez, Assistant Clerk-Recorder

 12.00

\* $R 0 0 0 5 4 2 7 0 4 0 3 \*

2012000778216 4:19 pm 12/14/12

117 403 N34  2

0.00 0.00 0.00 0.00 3.00 0.00 0.00 0.00

[SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY]

T.S. No. 12-20780                     APN: 423-308-01                       Loan No. 1004706217

### NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 4/19/2007. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state will be held by the duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to a Deed of Trust described below. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, with interest and late charges thereon, as provided in the note(s), advances, under the terms of the Deed of Trust, interest thereon; fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.

Trustor: **GARY R. KOLLER AND CYNTHIA D. KOLLER, HUSBAND AND WIFE AS JOT TENANTS**
Duly Appointed Trustee: Law Offices Of Les Zieve   Deed of Trust recorded 5/4/2007 as Instrument No. 2007000293050 in book --, page -- of Official Records in the office of the Recorder of Orange County, California,
Date of Sale:**1/8/2013** at 1:30 PM
Place of Sale:       At the North entrance to the County Courthouse 700  Civic Center Drive West, Santa Ana, CA 92701
Estimated amount of unpaid balance and other charges: **$1,172,345.72**
Note: Because the Beneficiary reserves the right to bid less than the total debt owed, it is possible that at the time of the sale the opening bid may be less than the total debt owed.

Street Address or other common designation of
real property:
Described as follows:
 As more fully described on said Deed of Trust.

**3811 RIVER AVENUE
NEWPORT BEACH, CA 92663**

A.P.N #.: **423-308-01**
The undersigned Trustee disclaims any liability for any incorrectness of the street address or other common designation, if any, shown above. If no street address or other common designation is shown, directions to the location of the property may be obtained by sending a written request to the beneficiary within 10 days of the date of first publication of this Notice of Sale.

NOTICE TO POTENTIAL BIDDERS: If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

NOTICE TO PROPERTY OWNER: The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale.  If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call (714) 848-9272 or visit this Internet Web site www.elitepostandpub.com, using the file number assigned to this case 12-20780.  Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web site.  The best way to verify postponement information is to attend the scheduled sale.

Dated:  **12/13/2012**          **Law Offices of Les Zieve, as Trustee**
**18377 Beach Blvd., Suite 210**
**Huntington Beach, California 92648**
**For Non-Automated Sale Information, call: (714) 848-7920**
**For Sale Information: (714) 848-9272   www.elitepostandpub.com**

**Christine O'Brien, Trustee Sale Officer**

THIS FIRM IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION WE OBTAINED WILL BE USED FOR THAT PURPOSE

CERTIFICATE OF SERVICE

UNITED STATES DISTRICT COURT   )
                )
CENTRAL DISTRICT OF CALIFORNIA  )

   I am a resident of the State of California, over the age of eighteen (18) and not a party to the within action.  My business address is 100 NORTH CITRUS STREET, SUITE 408, WEST COVINA, CA 91791.
   On February 5, 2014, I served the foregoing document(s) by placing a true and correct copy thereof in a sealed envelope(s):

**VERIFIED FIRST AMENDED COMPLAINT,**

On the interested parties listed below as follows:

Wright, Finlay & Zak, LLP
Nicole S. Dunn
4665 MacArthur Court, Suite 280    Attorney for Defendants Specialized Loan Servicing,
Newport Beach, CA 92660      LLC, U.S. Bank N.A.,

Doll, Amir & Eley, LLP
Amy I. Borlund
1888 Century Park East, Suite 1850
Los Angeles, CA 90067       Attorney for B.F. Saul Mortgage Company

☒  (BY MAIL) I deposited such envelope(s) in the mail at West Covina, California.  The envelope was mailed with postage thereon fully prepaid.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at West Covina, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒  (CM/ECF Electronic Filing) I caused the above document(s) to be transmitted to the office(s) of the addressee(s) listed above by electronic mail at the email address(es) set forth above pursuant to Fed.R.Civ.P.5(d)(1). A Notice of Electronic Filing (NEF) is generated automatically by the ECF system upon completion of an electronic filing. The NEF, when e-mailed to the e-mail address of record in the case, shall constitute the proof of service as required by Fed.R.Civ.P.5(d)(1). A copy of the NEF shall be attached to any document served in the traditional manner upon any party appearing pro se."

1   ☒      (Federal)   I declare that I am employed in the office of a member of the Bar of this Court
2              at whose direction the service was made.  I declare under penalty of perjury
              under the laws of the United States of America that the above is true and
3              correct.

4
              Executed on February 5, 2014, at West Covina, California.
5

6   Laura Dassori
    Type or Print Name                                    Signature
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28